# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN – MILWAUKEE DIVISION

| | |
|---|---|
| TAQUAYLA RUCKER, individually and on behalf of all others similarly situated,<br><br>      Plaintiff,<br><br>v.<br><br>MILWAUKEE ENTERTAINMENT LLC dba HEART BREAKERS, a Wisconsin Limited Liability Corporation; and DOES 1 through 10, inclusive,<br><br>      Defendants. | Case No.: 2:21-cv-692-BHL<br><br>**COLLECTIVE ACTION**<br><br>**DECLARATION OF JOHN P. KRISTENSEN IN SUPPORT OF PLAINTIFF'S UNOPPOSED MOTION FOR APPROVAL OF FLSA SETTLEMENT** |

I, John P. Kristensen, declare:

1.      I am an attorney licensed to practice before all Courts in the State of California. I am the Managing Partner at Kristensen LLP, Counsel of record for Plaintiff Taquayla Rucker ("Plaintiff" or "Rucker") in this action. I make this declaration of my own personal knowledge, and if called to testify, I could and would competently testify hereto under oath.

### QUALIFICATIONS OF COUNSEL

2.      I am currently the Managing Partner at Kristensen LLP. I am an attorney licensed to practice in the State of California.  I am admitted to practice before the United States District Courts for the Northern, Eastern, Southern, Central Districts of California, the United States

**DECLARATION OF JOHN P. KRISTENSEN**      **PAGE 1**
**IN SUPPORT OF UNOPPOSED MOTION FOR APPROVAL OF FLSA SETTLEMENT**
Case 2:21-cv-00692-BHL   Filed 10/20/21   Page 1 of 100   Document 22-1

District Court for the District of Colorado, the United States District Courts for the Eastern and Western District of Wisconsin and the United States District Court for the District of Columbia.

3.      I graduated from Washington & Lee University School of Law in Lexington, Virginia in 2002 where I received an academic scholarship. Upon graduation, I moved back to Los Angeles and quickly gained admission to the California bar. I began my civil career at Daniels, Fine, Israel, Schonbuch & Lebovits, LLP in Century City. I then spent four years at a multi-disciplinary practice, Avila & Peros, LLP.

4.      In 2008, I accepted employment at a firm, O'Reilly & Danko, which subsequently changed its name to O'Reilly || Collins. The firm was one of the preeminent Plaintiff's law firms in the country obtaining numerous seven and eight figure verdicts and settlements during my tenure.

5.      In 2011, I was responsible for a then record and maximum fine against an automotive company after I requested the federal government investigate an auto-manufacturer for its statements regarding why it was conducting a recall overseas, but not for similar vehicles in the United States. The manufacturer paid the maximum fine in excess of $16,000,000.00 as a result of my investigation.

6.      In 2011, the Daily Journal selected me as one of five associates to watch in the state of California in its annual 20 under 40 Edition. I was the sole Plaintiff's attorney to receive the accolade. I have also been named to Super Lawyers' Rising Stars for Southern California in 2012, 2013 and 2014. I have been named a Super Lawyer for Southern California every year since.

7.      I have tried employment and wrongful death trials and obtained numerous million dollar settlements for my clients, including against an exotic dance club. Our firm has tried

multiple cases over the last five years and was prepared to take this matter to trial as well.

8.      I have litigated against NBC, Enterprise Rent-A-Car, Spearmint Rhino, Ford Motor Company, Toyota Motor Company, General Motors, Taco Bell, Sony and numerous other large corporations. My practice has included in multiple appellate cases where I have argued successfully before the California Courts of Appeal.

9.      During the course of the Toyota Sudden Acceleration litigation, I was appointed by Hon. Anthony J. Mohr to the Plaintiff's Steering Committee and was re-appointed in 2012 by Hon. Lee Edmon. Judge Edmon also appointed me as a member of the national fee committee to recommend the allocations and disbursements of the common benefit fund.

10.      In 2012, I took a position with one of the nation's top Class Action law firms, Strange & Carpenter, where I was instrumental in preparing one of the bellwether sudden acceleration cases that resolved in December 2012. That case was a model for the California class claim that resolved along with the national case. Today, I remain in the role as the youngest attorney appointed to the Plaintiff' steering committees in the California Toyota Sudden Acceleration cases.

11.      In 2017, I obtained what was then a record Title IX settlement against UC Regents.

12.      I was appointed Class Counsel in the matter of *Mankin v. Mountain West Research Center, L.C.*, Case Number 2:13-cv-06447-DSF-AGR in the Central District of California. The class settlement in that matter was approved by Hon. Dale S. Fischer.

13.      I was appointed Class Counsel in the matter of *Kim v. Tinder, Inc., et al.*, Case Number  2:18-cv-03093-JFW-AS in the Central District of California. The class settlement in that matter was approved by the Court who also approved our request for attorney's fees and my

rate at $725.00 an hour.

14.     On August 7, 2019, I was appointed Class Counsel in the matter of *George v.*

*Shamrock Saloon II, LLC*, Case Number 17-cv-6663 (RA) (HBP) in the Southern District of

New York by Magistrate Judge Pitman. Class certification was contested and an objection on the

class certification, not my qualifications, was made to Hon. Ronnie Abrams, who adopted

Magistrate Judge Pitman's report and recommendations in its entirety.

15.     On October 23, 2019, in a contested motion for class certification in the Central

District of California, Hon. George H. Wu, appointed me as class counsel in the matter of *Lisa*

*Friedman v. Jillian Michaels, et al.*, No. 19-cv9414-GW(SSx) in the Central District of

California.

16.     Other than myself, several members of my firm have knowledge of this case and

have worked on this case with me with my oversight. I am noted in my firm's billing entries as

"JPK" and my hourly rate is $725.00 an hour.

17.     Jesenia A. Martinez, an Associate at my firm, has also worked on this case.

Jesenia attended Tufts University for her undergraduate degree and attended Southwestern

University School of Law, graduating from its prestigious SCALE accelerated program in May

2017. While in law school, Jesenia completed externships with Judge Kim McLane Wardlaw at

the United States Court of Appeals for the Ninth Circuit and Judge Dean D. Pregerson at the

United States District Court for the Central District of California. Jesenia was also part of Law

Review and was a Dean's Fellow and Teaching Assistant while in law school where she earned

several CALI and Witkin awards for excellence. She began working at Kristensen LLP after

taking the bar. Jesenia is noted in the firm's billing entries as "JAM" and her hourly rate is

$375.00 an hour.

18.     Alejandro Marin, an Associate at my firm who began on October 2020, also worked on this case. Alejandro obtained his JD from UC Davis in 2019. He began working at Kristensen LLP in October 2020 after clerking with Judge Dennis M. Cota at the U.S. District Court for the Eastern District of California. Alejandro is noted in the firm's billing entries as "AM" and his hourly rate is $275.00 an hour.

### THE SETTLEMENT

19.     The parties in this matter have executed a Settlement Agreement.

a.      I have attached hereto as **Exhibit 1** a true and correct copy of the Settlement Agreement[1] pertaining to Rucker's claims.

20.     Plaintiff worked as an exotic dancer at Heart Breakers in Milwaukee, Wisconsin from approximately 2019 to 2020.

21.     As this Court was aware, parties were actively engaged in discovery, and Plaintiff was anticipating filing a Motion for Conditional Certification pursuant to 29 U.S.C. 216(b) at the time of the settlement. Counsel engaged in good faith settlement discussions and reached an agreement for which Plaintiff is now seeking approval.

22.     Plaintiff was an exotic dancer at Showtime Gentlemen's club in Wausau, Wisconsin within the three years prior to the filing of the lawsuit.

23.     Plaintiff differentiated five types of claims. The first two were for failure to pay minimum wage or overtime pursuant to 29 U.S.C. §§ 206 and 207.

24.     Third, Plaintiff contends that dancers were charged house fees to work, fees which were illegal kickbacks pursuant to 29 C.F.R. § 531.35.

///

---

[1] The parties have agreed upon the Settlement Agreement. Defendant Milwaukee Entertainment, LLC's signed agreement will promptly be provided to the Court as a supplemental filing.

25. Plaintiff also had claims for two types of tipping violations. First, Plaintiff was "encouraged" to tip Heart Breaker's employees. The forced tipping, Plaintiff contends, is also a violation of 29 C.F.R. § 531.35, as it results in the dancers subsidizing the clubs' payment of wages to other employees. The second form of claimed damages for tips was the of individual private dances to customers which was retained by Defendant rather than being paid to Dancers. Defendant maintains these fees were fees charged by them and belonging to them.

26. Plaintiff contends that she worked at Heart Breakers from approximately late March 2019 to November 2020. Plaintiff worked roughly three days per week and eight hours per shift. Plaintiff estimates she worked approximately 228 shifts and paid and claims she was required to pay a nightly house fee and expected to tip out Heart Breaker's employees. The exact amount Plaintiff paid in house fees and tip outs was unknown at the time of settlement. Plaintiff estimated her damages to be at least $26,448.

27. However, at the time of the settlement discussions, Plaintiff did not possess any documents supporting the amount of shifts she claimed to have worked.

28. Defendant contested Plaintiff's claims and asserted that Plaintiff only worked a single shift at Heart Breakers on March 29, 2019.

29. The parties agreed to a gross settlement of $15,000. A number of factors contributed to the resolution. First, Defendants asserted that Plaintiff only worked at Heart Breakers for a single shift in March 29, 2019 and produced documentation to that effect. While Plaintiff believes she worked more than one shift within the relevant period, a risk existed that Plaintiff would be unable to demonstrate the full extent of her damages. Furthermore, the Covid-19 pandemic and the lack of insurance were strongly taken into account by Plaintiff in deciding to resolve the matter.

**Declaration of John P. Kristensen**                                                                 **Page 6**
**in Support of Unopposed Motion for Approval of FLSA Settlement**
Case 2:21-cv-00692-BHL   Filed 10/20/21   Page 6 of 100   Document 22-1

30. Plaintiff's counsel' lodestar was at least $12,292.50 and costs of $447.

a. I have attached hereto as **Exhibits 2** and **3** is a true and correct copy of the Kristensen LLP time entries and costs invoices, respectively.

31. Pursuant to the agreement, Plaintiff's counsel will seek $9,553 in fees (roughly $2,700 less than the lodestar of Kristensen LLP alone) and be reimbursed for $447 in costs. Plaintiff will receive $5,000 in total. In a fee bearing case, with a strong likelihood of liability on the employment issue, and the potential for additional opt in plaintiffs, there is incentive to proceed. However, the real effects on Covid-19 on exotic dance club defendants, no insurance coverage, and the real risk that Plaintiff would be unable to demonstrate the full extent of her damages played a substantial role in deciding to settle. The settlement is a compromise of disputed issues.

32. In exchange for the consideration described above, Plaintiff has agreed to dismiss her causes of action for alleged violations of the FLSA and any state wage and hour claims stemming from Plaintiff's employment as alleged in the operative Complaint.

33. The Court should approve the settlement because it reflects a reasonable compromise of bona fide dispute regarding Defendants' alleged FLSA liability. There was no collusion in reaching the Agreement. The Parties were adequately represented by competent counsel experienced in litigating cases under the FLSA, and the Agreements reached were the result of good-faith negotiation between the Parties. Substantial differences and risks existed for both Plaintiff and Defendant.

34. The Parties have strenuously different opinions about the classification of the dancers as employees or independent contractors and whether the dance fee charged by and collected by the Defendant belonged to the Defendant or was a tip belonging to the Plaintiff.

Plaintiff believed her case was strong, but there was the risk she would be unable to demonstrate the full extent of the days she worked at Heart Breakers. The settlement did not make Plaintiff necessarily whole. However, that is not a requirement, and would render most settlements unattainable.

35. This Settlement was an arm's length transaction negotiated between Mr. Kristensen and Ms. Nelson. The litigation could have continued until December 12, 2022, 14 months away.

36. The fees would have been insurmountable to a resolution at that point. The parties were able to exchange evidence regarding Plaintiff's tenure and concern about the potential damages was made clear. The parties were able to assess their risk at an early stage.

37. Counsel on both sides have experience in FLSA cases. As explained above, the incentive for Plaintiff's counsel to continue greatly outweighed the settlement resolution. The matter settled as it was a fair compromise at an early stage in the proceedings.

COMPARABLE FLSA SETTLEMENTS

38. Attached hereto as **Exhibit 4** is a true and correct copy of the Declaration of John P. Kristensen in Support of Motion for Approval of FLSA Settlement in *Ariel Macklin v. Biscayne Holding Corp et al*, 1:19-cv-00561-WES-PAS (D.R.I. August 23, 2021) wherein Plaintiffs' counsel describe their rates.

39. Attached hereto as **Exhibit 5** is a true and correct copy of the Court order granting Plaintiffs' Motion for Approval of FLSA Settlement in *Ariel Macklin v. Biscayne Holding Corp et al*, 1:19-cv-00561-WES-PAS (D.R.I. September 24, 2021) recognizing Plaintiffs' counsel's request for attorney's fees and costs as reasonable.

///

40.     Attached hereto as **Exhibit 6** is a true and correct copy of the Declaration of John P. Kristensen in Support of Motion for Approval of FLSA Settlement in *Truehart et al v. Dartmouth Clubs, Inc. et al*, 1:20-cv-10374-DJC (D. Mass. August 11, 2021) wherein Plaintiffs' counsel describe their rates.

41.     Attached hereto as **Exhibit 7** is a true and correct copy of the Court order granting Plaintiffs' Motion for Approval of FLSA Settlement in *Truehart et al v. Dartmouth Clubs, Inc. et al*, 1:20-cv-10374-DJC (D. Mass. October 1, 2021) recognizing Plaintiffs' counsel's request for attorney's fees and costs as reasonable.

42.     Attached hereto as **Exhibit 8** is a true and correct copy of the Declaration of John P. Kristensen in Support of Motion for Approval of FLSA Settlement in *Weiss v. 1709 Corporation, et a.l*, 3:20-cv-00990-slc (W.D. Wis. May 28, 2021) wherein Plaintiff's counsel describe their rates.

43.     Attached hereto as **Exhibit 9** is a true and correct copy of the Court order granting Plaintiffs' request for attorney's fees in *Weiss v. 1709 Corporation, et al.,* 3:20-cv-00990-slc (W.D. Wis. June 10, 2021).

44.     Attached hereto as **Exhibit 10** is a true and correct copy of the Court order approving the Fed. R. Civ. P. 23 class action settlement in *Byrne v. Santa Barbara Hospitality Services, Inc.*, C.A. No. 17-00527, Dkt. 178 (C.D. Cal. December 14, 2018).

I declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on Wednesday, October 20, 2021 at Los Angeles, California.

/s/ *John P. Kristensen*
_____
John P. Kristensen

# EXHIBIT

# "1"

## FULL SETTLEMENT AND FINAL RELEASE OF ALL CLAIMS

TAQUAYLA RUCKER, in consideration of FIFTEEN THOUSAND DOLLARS ($15,000.00)($5,000 to Ms. Rucker; $10,000 to Kristensen LLP for fees and costs), does hereby forever release and discharge MILWAUKEE ENTERTAINMENT LLC d/b/a Heart Breakers (hereafter referred to as the "released party") from any and all claims and causes of action, in any way arising out of or related to TAQUAYLA RUCKER performing as a dancer at Heart Breakers as more particularly alleged in District Court for the Eastern District of Wisconsin Case No. 21-CV-692, but this Release is not limited just to the claims asserted in the Complaint.

Payment will be made in the amount of $15,000 to Kristensen LLP CA IOLTA Account with five (5) days of approval of the settlement by the United States District Court.

This Release by TAQUAYLA RUCKER is also made for and binding upon her heirs, successors and assigns. By this agreement, any liability of subsidiaries, parent corporations, insurers, predecessors, successors, officers, directors, partners, members, managers, agents or employees of MILWAUKEE ENTERTAINMENT LLC d/b/a Heart Breakers (hereafter referred to as the "released parties") is also released and discharged. Further, any other persons or entities who are or might be liable, even though their identity or involvement may not be presently known, are fully released and discharged.

TAQUAYLA RUCKER represents that the released party has not made any representation or taken any position about the tax consequences of this Full Settlement and Final Release of All Claims (hereinafter "Release") or any amounts paid pursuant to this Release. A dispute regarding the tax status of any amounts referenced in this Release shall not affect the validity of this Release. TAQUAYLA RUCKER has had the opportunity to discuss the potential tax consequences of this Release with her attorney and agrees to indemnify and hold harmless the released party from any

and all costs and assessments including, but not limited to, delinquent taxes, penalties, and interest that may be levied against her in connection with this Release.

TAQUAYLA RUCKER expressly agrees that she will not seek or accept employment or seek to perform any type of service as an independent contractor or employee, or work with MILWAUKEE ENTERTAINMENT LLC d/b/a Heart Breakers in any capacity, now or in the future.

TAQUAYLA RUCKER and MILWAUKEE ENTERTAINMENT LLC d/b/a Heart Breakers agree not to disparage each other.

This Release fully extinguishes all claims and causes of action, arising out TAQUAYLA RUCKER performing as a dancer at Heart Breakers, including but not limited to, those for any and all claims or causes of action under federal or state statutes or other rules of law, including, but not limited to (1) the Fair Labor Standards Act, as amended, 29 U.S.C. § 201, *et seq*.; (2) Wisconsin's Wage Payment and Collection Laws, Wis. Stat. § 109.01 *et seq*; (3) Wisconsin Administrative Code §§ DWD 272, 274, *et seq*.; (4) Wisconsin Statutes Ch. 103, 104, 109, 895, *et seq*.; (5) the Wisconsin Fair Employment Act, §111.31-111.395; (6) Title VII, 42 U.S.C. 2000e et seq., as amended; (7) the Age Discrimination in Employment Act, as amended, 29 U.S.C. § 621 *et seq*.; and (8) the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq*.. Further, this Release fully extinguishes any claim arising out of TAQUAYLA RUCKER performing as a dancer at Heart Breakers for (1) back pay, front pay and/or lost benefits; (2) liquidated damages and interest; (3) penalties; (4) compensatory and/or punitive damages; (5) costs and disbursements; (6) attorney's fees; or (7) any other element of recovery.

This Release also fully extinguishes any claims or causes of action under the Wisconsin Uniform Marital Property Act. TAQUAYLA RUCKER agrees to indemnify the released party

DocuSign Envelope ID: A0888E1D-8C45-4BEA-9F7F-1B0D153D997B

from any claims arising out of the Wisconsin Uniform Marital Property Act, including any expenses incurred in the defense of such claims.

TAQUAYLA RUCKER further represents that no portion of this claim has been assigned to anyone else and that no other person or entity has any legal right to pursue this claim or share in the proceeds of the settlement, except state and federal taxing authorities, Kristensen LLP and Urban & Taylor, S.C. In making this representation TAQUAYLA RUCKER agrees to indemnify the released party for any money it may have to pay to any other person or entity asserting any claim arising out of or related to TAQUAYLA RUCKER performing as a dancer at Heart Breakers performing as a dancer at Heart Breakers, including any claims based upon lien, subrogation, derivation or assignment. TAQUAYLA RUCKER will indemnify the released party for any expenses incurred in defending such claims. Should such a lawsuit or claim be filed, then the released party will immediately tender the defense to TAQUAYLA RUCKER who will bear the costs of his own defense.

It is understood and agreed that this Release is a full compromise of a disputed claim, and this settlement, or the payment of money, is not to be construed as an admission of liability by the released party. It is recognized that the released party deny that it is liable for the claimed damages. It is hereby stipulated that no party to this Release is to be considered a "prevailing party" for any purpose.

It is also understood that the money paid for this unqualified Release is received not only as a full satisfaction for all known and unknown injuries and damages but, also, is received for future injuries and damages arising out of the incidents subject to this Release. The extent of any future injuries and damages is unknown, but it is understood that it may result in a condition substantially different than it is today.

DocuSign Envelope ID: A0888E1D-8C45-4BEA-9F7F-1B0D153D997B

With full knowledge and understanding of the contents of this Release, TAQUAYLA RUCKER voluntarily enters into this settlement and does so without having relied on any statement or representation by the released parties, their representatives, or anyone retained by them. TAQUAYLA RUCKER acknowledges that she has been represented by legal counsel prior to and during this entire settlement process and now as she signs this Full Settlement and Final Release of All Claims.

The statements in this Full Settlement and Final Release, which consists of four pages, are contractual terms and are not mere recitals. Any questions concerning this Release shall be determined and governed by the terms of this Release and the law of the State of Wisconsin.

A facsimile, scanned or e-mailed version, including DocuSign, of this Full Settlement and Final Release of All Claims shall be valid as the original.

Dated:____10/14/2021_____

DocuSigned by:

_____
1122C9FF8AED406...

TAQUAYLA RUCKER

Dated:_____

_____
NEELA SATHIYAMOORTHY
a duly authorized representative of MILWAUKEE
ENTERTAINMENT LLC d/b/a Heart Breakers

# EXHIBIT "2"



**Kristensen LLP**

# INVOICE

Invoice # 27
Date: 10/20/2021
Due On: 11/19/2021

12540 Beatrice Street, Ste 200
Los Angeles, CA 90066

Taquayla Rucker

## D1100

## Rucker v. Heart Breakers Exotic

| Type | Attorney | Date | Notes | Quantity | Rate | Total |
|------|----------|------|-------|----------|------|-------|
| Service | John Kristensen | 06/02/2021 | Prepare: Prepare retainer. | 0.60 | $725.00 | $435.00 |
| Service | John Kristensen | 06/02/2021 | Prepare: Prepare authorization for records. | 0.30 | $725.00 | $217.50 |
| Service | John Kristensen | 06/02/2021 | Prepare: Prepare consent to join lawsuit. | 0.30 | $725.00 | $217.50 |
| Service | John Kristensen | 06/02/2021 | Phone Call: Phone call with client. | 0.30 | $725.00 | $217.50 |
| Service | John Kristensen | 06/03/2021 | Prepare: Prepare Complaint. | 1.90 | $725.00 | $1,377.50 |
| Service | John Kristensen | 06/03/2021 | Prepare: Prepare Civil Cover Sheet. | 0.30 | $725.00 | $217.50 |
| Service | John Kristensen | 06/03/2021 | Prepare: Prepare Summons of Milwaukee Entertainment, LLC. | 0.30 | $725.00 | $217.50 |
| Service | John Kristensen | 06/03/2021 | Prepare: Prepare Status Report to Client. | 0.40 | $725.00 | $290.00 |
| Service | John Kristensen | 06/04/2021 | Prepare: Prepare LR 7.1. Disclosure. | 0.40 | $725.00 | $290.00 |
| Service | John Kristensen | 06/04/2021 | Prepare: Prepare amended summons. | 0.30 | $725.00 | $217.50 |
| Service | John Kristensen | 06/07/2021 | Review: Review assignment of Judge Ludwig. | 0.10 | $725.00 | $72.50 |
| Service | John Kristensen | 06/07/2021 | Prepare: Prepare email to Jay Urban re Judge Ludwig. | 0.10 | $725.00 | $72.50 |
| Service | John Kristensen | 06/10/2021 | Review: Review email from ES to Urban's office with service packages. | 0.10 | $725.00 | $72.50 |

| | | | | | | |
|---|---|---|---|---|---|---|
| Service | John Kristensen | 06/13/2021 | Phone Call: Phone call with Jarrett Ellzey re strategy. | 0.10 | $725.00 | $72.50 |
| Service | Emma Salmon | 06/15/2021 | Draft Letter re Documents | 0.20 | $0.00 | $0.00 |
| Service | John Kristensen | 06/15/2021 | Prepare: Prepare correspondent to Rucker re gathering documents and evidence in preparation of discovery and trial. | 0.40 | $725.00 | $290.00 |
| Service | John Kristensen | 06/18/2021 | Phone Call: Phone call with Ellzey re strategy. | 0.10 | $725.00 | $72.50 |
| Service | John Kristensen | 06/18/2021 | Phone Call: Phone call with Jay Urban re strategy. | 0.10 | $725.00 | $72.50 |
| Service | John Kristensen | 06/18/2021 | Prepare: Prepare rejection of magistrate. | 0.30 | $725.00 | $217.50 |
| Service | John Kristensen | 06/21/2021 | Prepare: Prepare notice of proof of service on Heart Breakers. | 0.40 | $725.00 | $290.00 |
| Service | John Kristensen | 06/21/2021 | Review: Review email from Jay Urban with proof of service. | 0.10 | $725.00 | $72.50 |
| Service | John Kristensen | 06/21/2021 | Prepare: Prepare email to Jay Urban re proof of service. | 0.10 | $725.00 | $72.50 |
| Service | John Kristensen | 06/22/2021 | Review: Review NEF 5. | 0.10 | $725.00 | $72.50 |
| Service | John Kristensen | 06/24/2021 | Phone Call: Phone call with JAM and Ellzey re status. | 0.10 | $725.00 | $72.50 |
| Service | Jesenia Martinez | 07/06/2021 | Review ES email circulating Dkts. 7-10 | 0.10 | $375.00 | $37.50 |
| Service | John Kristensen | 07/06/2021 | Review: Review Answer to Complaint. | 0.20 | $725.00 | $145.00 |
| Service | John Kristensen | 07/06/2021 | Prepare: Prepare email to AM re filing a motion to strike affirmative defenses. | 0.10 | $725.00 | $72.50 |
| Service | John Kristensen | 07/06/2021 | Review: Review Notice of Appearance of Mary Nelson. | 0.10 | $725.00 | $72.50 |
| Service | John Kristensen | 07/06/2021 | Review: Review defendant's corporate disclosures. | 0.10 | $725.00 | $72.50 |
| Service | John Kristensen | 07/06/2021 | Review: Review Notice of Appearance of Jeffrey Nichols. | 0.10 | $725.00 | $72.50 |
| Service | John Kristensen | 07/12/2021 | Review: Review Notice of Scheduling Conference. | 0.10 | $725.00 | $72.50 |
| Service | John Kristensen | 07/12/2021 | Prepare: Prepare email to AM re Rule 16 conference. | 0.10 | $725.00 | $72.50 |
| Service | Alejandro Marin | 07/12/2021 | Review: Reviewed deadlines for Rule 26 conference and submitted | 0.10 | $250.00 | $25.00 |

| | | | deadlines to staff for calendaring. | | | |
|---|---|---|---|---|---|---|
| Service | Alejandro Marin | 07/27/2021 | E105 Telephone: Call with Jeff Nichols re Rule 26 conference; email to Mary Nelson re same. | 0.20 | $250.00 | $50.00 |
| Service | Alejandro Marin | 07/28/2021 | E105 Telephone: Voice message to Rucker re background of time at club. | 0.10 | $250.00 | $25.00 |
| Service | Alejandro Marin | 07/29/2021 | Prepare: Reviewed case files and case status in preparation for Rule 26 conference with opposing counsel. | 0.30 | $250.00 | $75.00 |
| Service | Alejandro Marin | 07/29/2021 | E105 Telephone: Rule 26 Conference with opposing counsel; email to co-counsel re same. | 0.30 | $250.00 | $75.00 |
| Service | John Kristensen | 07/29/2021 | Review: Review AM email re Rule 26 conference. to defense counsel. | 0.10 | $725.00 | $72.50 |
| Service | John Kristensen | 07/29/2021 | Review: Review AM follow up email re Rule 26 conference. to defense counsel. | 0.10 | $725.00 | $72.50 |
| Service | John Kristensen | 07/29/2021 | Review: Review email from Mary Nelson re Rule 26 conference. | 0.10 | $725.00 | $72.50 |
| Service | Alejandro Marin | 07/30/2021 | E105 Telephone: Left voicemail to Rucker for her to call back to discuss case. | 0.10 | $250.00 | $25.00 |
| Service | Alejandro Marin | 07/30/2021 | Review: Reviewed case status. | 0.10 | $250.00 | $25.00 |
| Service | Alejandro Marin | 08/11/2021 | Review: Reviewed letter from opposing counsel re dates Rucker worked at Heartbreakers. | 0.10 | $250.00 | $25.00 |
| Service | Alejandro Marin | 08/11/2021 | E105 Telephone: Call, voice message, and email re dates Rucker worked at Heartbreakers. | 0.10 | $250.00 | $25.00 |
| Service | John Kristensen | 08/11/2021 | Review: Review correspondence and documents from defense counsel. | 0.20 | $725.00 | $145.00 |
| Service | John Kristensen | 08/11/2021 | Prepare: Prepare email in response to correspondence and documents from defense counsel. | 0.10 | $725.00 | $72.50 |
| Service | John Kristensen | 08/11/2021 | Review: Review email from Alejandro to Rucker. | 0.10 | $725.00 | $72.50 |
| Service | Alejandro Marin | 08/12/2021 | Draft: Drafted Rule 26 discovery plan, submitted to opposing counsel for review and approval. | 0.80 | $250.00 | $200.00 |
| Service | Jesenia Martinez | 08/12/2021 | Review AM email re draft discovery plan | 0.10 | $375.00 | $37.50 |

| Service | Alejandro Marin | 08/12/2021 | Draft: Revisions to discovery plan. | 0.20 | $250.00 | $50.00 |
|---------|-----------------|------------|-------------------------------------|------|---------|--------|
| Service | John Kristensen | 08/12/2021 | Review: Review email from AM to defense counsel with draft Rule 26 plan. | 0.10 | $725.00 | $72.50 |
| Service | John Kristensen | 08/12/2021 | Review: Review draft Rule 26 plan. | 0.30 | $725.00 | $217.50 |
| Service | John Kristensen | 08/12/2021 | Review: Review AM email re Rule 26 report final. | 0.10 | $725.00 | $72.50 |
| Service | Jesenia Martinez | 08/13/2021 | Review AM email re call to Chambers to reschedule Scheduling Conference | 0.10 | $375.00 | $37.50 |
| Service | John Kristensen | 08/15/2021 | Review: Review email from AM re continuance of hearing. | 0.10 | $725.00 | $72.50 |
| Service | John Kristensen | 08/15/2021 | Review: Review text only order continuing status conference. | 0.10 | $725.00 | $72.50 |
| Service | Alejandro Marin | 08/15/2021 | Draft: Prepared interrogatories and RFPs set one to send to Defendant. | 1.00 | $250.00 | $250.00 |
| Service | Jesenia Martinez | 08/15/2021 | Review AM email re draft discovery requests | 0.10 | $375.00 | $37.50 |
| Service | Jesenia Martinez | 08/15/2021 | Review JPK email response re draft discovery requests | 0.10 | $375.00 | $37.50 |
| Service | Alejandro Marin | 08/15/2021 | Correspondence: Final review of Plaintiff's discovery requests, added COS, finalized and served to opposing counsel. | 0.30 | $250.00 | $75.00 |
| Service | Jesenia Martinez | 08/15/2021 | Review AM email to defense counsel serving RFPs 1 and Rogs 1 | 0.10 | $375.00 | $37.50 |
| Service | Jesenia Martinez | 08/16/2021 | Review ES email re calendaring deadline for Defendants to respond to discovery requests | 0.10 | $375.00 | $37.50 |
| Service | Alejandro Marin | 08/16/2021 | Correspondence: Email to ES re calling Rucker's emergency contact to reach Rucker. | 0.10 | $250.00 | $25.00 |
| Service | Alejandro Marin | 08/16/2021 | Review: Reviewed email from ES re attempts to contact Rucker through her brother | 0.10 | $250.00 | $25.00 |
| Service | Jesenia Martinez | 08/16/2021 | Review AM email re Rucker contact info | 0.10 | $375.00 | $37.50 |
| Service | Jesenia Martinez | 08/16/2021 | Review ES email response re Rucker contact info | 0.10 | $375.00 | $37.50 |
| Service | Jesenia Martinez | 08/16/2021 | Review ES follow up email response re Rucker contact info | 0.10 | $375.00 | $37.50 |

| Service | John Kristensen | 08/16/2021 | Review: Review email from AM to defense counsel with written discovery. | 0.10 | $725.00 | $72.50 |
|---------|-----------------|------------|--------------------------------------------------------------------------|------|---------|--------|
| Service | Alejandro Marin | 08/17/2021 | Review: Reviewed case status. | 0.10 | $250.00 | $25.00 |
| Service | Alejandro Marin | 08/31/2021 | Investigation: Attempts to reach Rucker to discuss case status. | 0.40 | $250.00 | $100.00 |
| Service | John Kristensen | 09/02/2021 | Court Time: telephonic status conference (Rule 16). | 0.30 | $725.00 | $217.50 |
| Service | John Kristensen | 09/02/2021 | Phone Call: phone call with defense counsel. | 0.10 | $725.00 | $72.50 |
| Service | John Kristensen | 09/02/2021 | Prepare: memo on hearing for file and email to co counsel. | 0.20 | $725.00 | $145.00 |
| Service | John Kristensen | 09/05/2021 | Review: NEF 16. | 0.10 | $725.00 | $72.50 |
| Service | John Kristensen | 09/05/2021 | Review: NEF 17. | 0.10 | $725.00 | $72.50 |
| Service | John Kristensen | 09/05/2021 | Review: Signed Scheduling Order. | 0.10 | $725.00 | $72.50 |
| Service | John Kristensen | 09/05/2021 | Prepare: email to investigator re client. | 0.10 | $725.00 | $72.50 |
| Service | John Kristensen | 09/05/2021 | Prepare: email to JAM re strategy. | 0.10 | $725.00 | $72.50 |
| Service | John Kristensen | 09/06/2021 | Phone Call: with AM re status. | 0.10 | $725.00 | $72.50 |
| Service | Alejandro Marin | 09/13/2021 | Draft: Drafted and served Plaintiff's initial disclosures. | 0.60 | $250.00 | $150.00 |
| Service | John Kristensen | 09/14/2021 | Review: Notice of Settlement. | 0.10 | $725.00 | $72.50 |
| Service | John Kristensen | 09/14/2021 | Review: AM email to Mary Nelson re settlement. | 0.10 | $725.00 | $72.50 |
| Service | Alejandro Marin | 09/14/2021 | Draft: Drafted and filed notice of settlement. | 0.40 | $250.00 | $100.00 |
| Service | Alejandro Marin | 09/15/2021 | Meeting: Meeting with JM re payments to KLLP trust account. | 0.10 | $250.00 | $25.00 |
| Service | Alejandro Marin | 09/15/2021 | Correspondence: Email to Mary Nelson re payments to KLLP trust account. | 0.10 | $250.00 | $25.00 |
| Service | John Kristensen | 09/15/2021 | Review: email from AM re payment instructions. | 0.10 | $725.00 | $72.50 |
| Service | John Kristensen | 09/15/2021 | Review: Court Order re settlement. | 0.10 | $725.00 | $72.50 |
| Service | John Kristensen | 09/21/2021 | Meeting: KLLP staff meeting re case. | 0.10 | $725.00 | $72.50 |
| Service | Jesenia Martinez | 09/21/2021 | Discuss case during staff meeting | 0.10 | $375.00 | $37.50 |
| Service | Alejandro Marin | 09/23/2021 | Investigation: Attempts to contact Rucker through phone calls and | 0.20 | $250.00 | $50.00 |

| | | | through her brother. | | | |
|---|---|---|---|---|---|---|
| Service | Alejandro Marin | 10/01/2021 | Correspondence: Attempts to contact Rucker and email to Rucker re settlement. | 0.30 | $250.00 | $75.00 |
| Service | Alejandro Marin | 10/03/2021 | Review: Reviewed draft release. | 0.20 | $250.00 | $50.00 |
| Service | Alejandro Marin | 10/03/2021 | Correspondence: Email re Rucker's new contact information and potential edits to draft release. | 0.10 | $250.00 | $25.00 |
| Service | Alejandro Marin | 10/04/2021 | E105 Telephone: Call with Rucker re case settlement. | 0.10 | $250.00 | $25.00 |
| Service | Alejandro Marin | 10/04/2021 | Draft: Drafted motion for extension of time to file Mx for Approval of FLSA Settlement. | 0.40 | $250.00 | $100.00 |
| Service | John Kristensen | 10/05/2021 | Prepare: Prepare edits to release. | 0.30 | $725.00 | $217.50 |
| Service | John Kristensen | 10/05/2021 | Prepare: Prepare correspondence to defense counsel with redlines to release. | 0.10 | $725.00 | $72.50 |
| Service | Alejandro Marin | 10/06/2021 | E124 Other: Finalized and filed motion for extra time to file Mx for approval of FLSA settlement. | 0.20 | $250.00 | $50.00 |
| Service | John Kristensen | 10/07/2021 | Review: text order re extension of time. | 0.10 | $725.00 | $72.50 |
| Service | Alejandro Marin | 10/08/2021 | Review: Reviewed JPK email re release red lines. | 0.10 | $250.00 | $25.00 |
| Service | John Kristensen | 10/13/2021 | Review: and edit proposed release. | 0.20 | $725.00 | $145.00 |
| Service | John Kristensen | 10/13/2021 | Prepare: email to defense counsel re release. | 0.10 | $725.00 | $72.50 |
| Service | John Kristensen | 10/13/2021 | Phone Call: phone call with Mary Nelson re release. | 0.10 | $725.00 | $72.50 |
| Service | Alejandro Marin | 10/13/2021 | Review: Reviewed emails from opposing counsel re revised release. | 0.10 | $250.00 | $25.00 |
| Service | Alejandro Marin | 10/13/2021 | Review: Reviewed JPK email requesting final version of the release. | 0.10 | $250.00 | $25.00 |
| Service | John Kristensen | 10/14/2021 | Review: review email from Nelson with final release. | 0.10 | $725.00 | $72.50 |
| Service | John Kristensen | 10/14/2021 | Prepare: email to AM re obtaining execution by Rucker of final release. | 0.10 | $725.00 | $72.50 |
| Service | Alejandro Marin | 10/14/2021 | Correspondence: Finalized settlement agreement and submitted to Rucker for signature; sent email re same. | 0.20 | $250.00 | $50.00 |

| Service | Alejandro Marin | 10/19/2021 | Draft: Began drafting motion for FLSA settlement approval. | 1.00 | $250.00 | $250.00 |
| Service | Alejandro Marin | 10/19/2021 | E105 Telephone: Texts with Rucker re times she worked at Heart Breakers. | 0.10 | $250.00 | $25.00 |
| Service | Jesenia Martinez | 10/20/2021 | Review AM email re case costs | 0.10 | $375.00 | $37.50 |
| Service | Alejandro Marin | 10/20/2021 | Draft: Further drafting of motion for approval of FLSA settlement. | 3.00 | $250.00 | $750.00 |

|  |  | **Total** | **$12,292.50** |

## Detailed Statement of Account

### Current Invoice

| Invoice Number | Due On | Amount Due | Payments Received | Balance Due |
|---|---|---|---|---|
| 27 | 11/19/2021 | $12,292.50 | $0.00 | $12,292.50 |
|  |  |  | **Outstanding Balance** | **$12,292.50** |
|  |  |  | **Total Amount Outstanding** | **$12,292.50** |

Please make all amounts payable to: Kristensen LLP

Please pay within 30 days.

# EXHIBIT "3"

**Kristensen LLP**
12540 Beatrice Street, # 200
Los Angeles, CA  90066
(310) 507-7924
www.kristensenlaw.com

# Invoice



BILL TO

Rucker v. Heart Breakers
9440 W. National Ave
West Allis, MI 53227

| INVOICE # | DATE | TOTAL DUE | DUE DATE | TERMS | ENCLOSED |
|---|---|---|---|---|---|
| 1171 | 10/20/2021 | $447.00 | 11/19/2021 | Net 30 | |

| DATE | ACTIVITY | AMOUNT |
|---|---|---|
| 06/03/2021 | **Filing Fee**<br>Wisconsin Eastern District Court | 402.00 |
| 06/10/2021 | **Process Server**<br>Person served, Milwaukee Entertainment LLC | 45.00 |

BALANCE DUE **$447.00**

# EXHIBIT

# "4"

# IN THE UNITED STATES DISTRICT COURT
# DISTRICT OF RHODE ISLAND

|  |  |
|---|---|
| ARIEL MACKLIN on Behalf of Herself and on Behalf of All Others Similarly Situated,<br><br>　　　　Plaintiff,<br><br>v.<br><br>BISCAYNE HOLDING CORP. d/b/a WILD ZEBRA and CHRISTOPHER VIANELLO,<br><br>　　　　Defendants. | Civil Action No.: 1:19-cv-00561-WES<br><br>**COLLECTIVE ACTION**<br><br>**DECLARATION OF JOHN P. KRISTENSEN IN SUPPORT OF PLAINTIFFS' UNOPPOSED MOTION FOR APPROVAL OF FLSA SETTLEMENT**<br><br>Complaint Filed: October 18, 2019 |

## DECLARATION OF JOHN P. KRISTENSEN

I, John P. Kristensen, hereby declare as follows:

1.      I am an attorney licensed to practice before all Courts in the State of California. I am the Managing Partner at Kristensen LLP, I have been admitted *Pro Hac Vice* in this matter as counsel of record for plaintiffs Ariel Macklin ("Macklin"), Sierra Acosta ("Acosta"), Yalett Alejandro ("Alejnadro"), Alicia Barnella ("Barnella"), Kimberly Davila ("Davila"), Michaelia Davis ("Davis"), Nicole Ely ("Ely"), DeAnna Gallo ("Gallo"), Shannon Gavel ("Gavel"), Brittney Guilmette ("Guilmette"), Lashaunda Ingram ("Ingram"), Elizabeth James ("James"), Deja Jones ("Jones"), Sancharae Kelley ("Kelley"), Daizha Pittman ("Pittman"), Natasha Sajous ("Sajous"), Kaitlyn Scola ("Scola"), Chanel Sosa ('Sosa"), Kaitlin Throckmorton ("Throckmorton"), Alyssa Truehart ("Truehart"), Jasmine Vazquez ("Vazquez"), and Shakiyla Zito ("Zito") (collectively, "Plaintiffs") in this action. I make this declaration of my own personal knowledge, and if called to testify, I could and would competently testify hereto under oath.

### QUALIFICATIONS OF COUNSEL

2.      I am currently the Managing Partner at Kristensen LLP. I am an attorney licensed to practice in the state California.  I am admitted to practice before the United States District Courts for the Northern, Eastern, Southern, Central Districts of California, the United District Court for the District of Colorado, the United District Court for the Western and Eastern Districts of Wisconsin, the United States District Court for the Ninth Circuit Court of Appeals, and U.S. District Court for the District of Columbia.

3.      I graduated from Washington & Lee University School of Law in Lexington, Virginia in 2002 where I received an academic scholarship. Upon graduation, I moved back to Los Angeles and quickly gained admission to the California bar. I began my civil career at Daniels, Fine, Israel, Schonbuch & Lebovits, LLP in Century City. I then spent four years at a multi-disciplinary practice, Avila & Peros, LLP.

///

4.      In 2008, I accepted employment at a firm, O'Reilly & Danko, which subsequently changed its name to O'Reilly ‖ Collins. The firm was one of the preeminent plaintiffs' law firms in the country obtaining numerous seven and eight figure verdicts and settlements during my tenure.

5.      In 2011, I was responsible for a then record and maximum fine against an automotive company after I requested the federal government investigate an auto-manufacturer for its statements regarding why it was conducting a recall overseas, but not for similar vehicles in the United States. The manufacturer paid the maximum fine in excess of $16,000,000.00 as a result of my investigation.

6.      In 2011, the Daily Journal selected me as one of five associates to watch in the state of California in its annual 20 under 40 edition. I was the sole plaintiffs' attorney to receive the accolade. I have also been named to Super Lawyers' Rising Stars for Southern California in 2012, 2013 and 2014. I have been named a Super Lawyer for Southern California every year since.

7.      I have tried employment and wrongful death trials and obtained numerous million dollar settlements for my clients, including against an exotic dance club. Our firm has tried multiple cases over the last five years and was prepared to take this matter to trial as well.

8.      I have litigated against NBC, Enterprise Rent-A-Car, Spearmint Rhino, Ford Motor Company, Toyota Motor Company, General Motors, Taco Bell, Sony and numerous other large corporations. My practice has included in multiple appellate cases where I have argued successfully before the California Courts of Appeal.

9.      During the course of the Toyota Sudden Acceleration litigation, I was appointed by Hon. Anthony J. Mohr to the Plaintiffs' Steering Committee and was re-appointed in 2012 by Hon. Lee Edmon. Judge Edmon also appointed me as a member of the national fee committee to recommend the allocations and disbursements of the common benefit fund.

10.     In 2012, I took a position with one of the nation's top Class Action law firms, Strange & Carpenter, where I was instrumental in preparing one of the bellwether sudden

acceleration cases that resolved in December 2012. That case was a model for the California class claim that resolved along with the national case. Today, I remain in the role as the youngest attorney appointed to the plaintiffs' steering committees in the California Toyota Sudden Acceleration cases.

11.     In 2017, I obtained what was then a record Title IX settlement against UC Regents.

12.     I was appointed Class Counsel in the matter of *Mankin v. Mountain West Research Center, L.C.*, Case Number 2:13-cv-06447-DSF-AGR in the Central District of California. The class settlement in that matter was approved by Hon. Dale S. Fischer.

13.     I was appointed Class Counsel in the matter of *Kim v. Tinder, Inc., et al.*, Case Number 2:18-cv-03093-JFW-AS in the Central District of California. The class settlement in that matter was approved by the Court who also approved our request for attorney's fees and my rate at $725.00 an hour.

14.     On August 7, 2019, I was appointed Class Counsel in the matter of *George v. Shamrock Saloon II, LLC*, Case Number 17-cv-6663 (RA) (HBP) in the Southern District of New York by Magistrate Judge Pitman. Class certification was contested and an objection on the class certification, not my qualifications, was made to Hon. Ronnie Abrams, who adopted Magistrate Judge Pitman's report and recommendations in its entirety.

15.     On October 23, 2019, in a contested motion for class certification in the Central District of California, Hon. George H. Wu, appointed me as class counsel in the matter of *Lisa Friedman v. Jillian Michaels, et al.*, No. 19-cv9414-GW(SSx) in the Central District of California.

16.     Other than myself, several members of my firm have knowledge of this case and have worked on this case with me with my oversight. I am noted in my firm's billing entries as "JK."

17.     Jesenia A. Martinez, an Associate at my firm, has also worked on this case. Jesenia attended Tufts University for her undergraduate degree and attended Southwestern University School of Law, graduating from its prestigious SCALE accelerated program in May 2017. While

in law school, Jesenia completed externships with Judge Kim McLane Wardlaw at the United States Court of Appeals for the Ninth Circuit and Judge Dean D. Pregerson at the United States District Court for the Central District of California. Jesenia was also part of Law Review and was a Dean's Fellow and Teaching Assistant while in law school where she earned several CALI and Witkin awards for excellence. She began working at Kristensen LLP after taking the bar. Jesenia is noted in the firm's billing entries as "JM" and her hourly rate is $350.00 an hour.

18.     Jacob J. Ventura, an Associate at my firm until the fall of 2020, had also worked on this case. Jacob attended the University of Massachusetts Dartmouth for his undergraduate degree and attended Washington and Lee University School of Law. While in law school, Jacob completed clerkships with the Rhode Island Supreme Court as well as for the Honorable Judge Diane Finkle of the U.S. Bankruptcy Court District of Rhode Island. Jacob also completed externships with the U.S. House of Representatives Judiciary Committee, and for attorney Peter Robinson, Defense Counsel at the International Criminal Tribunal (former Yugoslavia). He began working at Kristensen LLP in 2019 after clerking for a real estate firm in Massachusetts. Jacob is noted in the firm's billing entries as "JV" and his hourly rate is $300.00 an hour.

19.     Alejandro Marin, an Associate at our firm when began on October 2020, also worked on this case. Alejandro attended obtained his JD from UC Davis in 2019. He began working at Kristensen LLP in October 2020 after clerking with Judge Dennis M. Cota at the U.S. District Court for the Eastern District of California. Alejandro is noted in the firm's billing entries as "AM" and his hourly rate is $250.00 an hour.

20.     Jenny Mitchell joined the firm in October 2018 as a paralegal. In February 2019 she achieved her Paralegal Accreditation with distinction through UCLA – an ABA accredited program. She received her undergraduate degree from Vassar College and a Masters from Seattle University. She has over two decades of writing, research and process improvement experience. Jenny is noted in the firm's billing entries as "JM" and her hourly rate is $125.00 an hour.

///

---

21.     Emma Salmon joined the firm in November 2020 as a legal assistant and had prior experience in the health care field. She obtained her Bachelor's degree in English in 2018 from UC Santa Barbara. Emma is noted in the firm's billing entries as "ES" and her hourly rate is $125.00 an hour.

22.     Juliana Villalobos joined the law firm in August 2019 as a legal assistant. She graduated UC Davis with a Bachelors in International Relations with an emphasis on Arab Studies and International Law. She is currently enrolled in the University of Arizona's Masters of Law online program. Prior to working at the firm, she was a legal intern in Washington D.C. for the Washington Lawyers Committee, she interned at SEIU Local 1000 a union in Sacramento, and worked as an accountant part time. Juliana is noted in the firm's billing entries as "JV" and her hourly rate was $125.00 an hour.

23.     Luz Portillo joined the firm in February 2017 as a legal assistant/paralegal. She previously worked in the legal sector for two years prior to joining our firm. In December of 2015, she obtained her Bachelor's degree in Politics and Latin American and Latino Studies from UC Santa Cruz.  Luz is noted in the firm's billing entries as "LP" and her hourly rate was $125.00 an hour.

24.     Kenia Aguilar joined the firm in October 2019 as an office assistant. She is planning to continue her studies to receive an AA + Cert. in Business Administration from LBCC. Kenia is noted in the firm's billing entries as "KA" and her hourly rate was $125.00 an hour.

25.     Jarrett L. Ellzey has been a litigator since his career began in 2003 when he graduated from South Texas College of Law in Houston, Texas. Since the beginning of his career, Jarrett has represented plaintiffs and defendants in matters ranging from simple breach of contract cases involving two small businesses, to nationwide consumer class actions in state and federal courts across the nation, including Texas, California, Florida, New York, Illinois, Pennsylvania, Georgia, Oklahoma, and Mississippi.

///

26.     Since Hughes Ellzey, LLP opened in 2010, Jarrett and his partner Craft Hughes have tried dozens of cases and, during only a five-year stretch, succeeded in obtaining over $23 million in verdicts. Jarrett served as lead counsel for the plaintiff in a commercial real estate dispute winning one of the largest fraud verdicts in Texas, earning him and the firm honoree distinction in the Texas Verdict Hall of Fame by Texas Lawyer VerdictSearch and recognition for one of the largest civil awards in Texas in 2012. Hughes Ellzey, LLP is now Ellzey & Associates, PLLC. Had this matter proceeded to trial, Jarrett would have sought *pro hac vice* admission. Jarrett's hourly rate is $725.00 and he uses the initials "JE."

27.     In addition, Alice Newlin and Victoria Morales of Hughes Ellzey provided paralegal support for their work on this matter. Alice uses the initials "AN" and Victoria uses the initials "VM." Both Alice and Victoria's hourly rates are $150.00.

28.     Leigh S. Montgomery, an attorney with Ellzey & Associates, PLLC, has spent her entire legal career helping individuals and small businesses maximize the results they can achieve from the civil justice system since 2008 when she graduated from Baylor University Law School in Waco, Texas. Leigh spent the first five years of her career assisting those individuals and businesses devastated by natural catastrophes such as Hurricane Ike and Hurricane Harvey. She is proud to have assisted hundreds of individuals and small businesses in getting the money and assistance necessary to put their lives back together.

29.     Since 2013, Leigh has represented individuals injured in truck, auto or on the job incidents. With her background in fighting insurance companies, she has helped many injured individuals get the maximum benefits and help they deserve. Leigh's hourly rate is $450.00 and she uses the initials "LM."

30.     Ghazzaleh Rezazadeh, an attorney with Ellzey & Associates, PLLC, has been a litigator since 2010 and has represented both plaintiffs and defendants. She spent the majority of her career representing individuals and small businesses who sustained catastrophic damage to their homes and businesses as a result of hurricanes and other catastrophic events. Ghazzaleh is a

highly skilled legal writer with significant experience preparing all manner of arguments and briefs to be presented to both trial and appellate courts. She enjoys using her passion for written word and keen analytical eye to zealously advocate for her clients. She obtained her undergraduate degree in 2006 from Southern Methodist University and her law degree from South Texas College of Law in 2009. Ghazzaleh's hourly rate is $375.00 and she uses the initials "GR."

31.     Chip Muller, graduated from Middlebury College, B.A., 1993. He obtained his Master's Degree from Boston University and his J.D. from the University of North Carolina School of Law. He is admitted to practice in Rhode Island, Massachusetts, and Connecticut. Chip's hourly rate is $400.00 an hour. Chip's paralegal, Donna Hayden assisted in this matter. Donna's hourly rate is $125.00 an hour.

## THE SETTLEMENT

32.     Under the Agreements, Defendants have agreed to pay Plaintiffs a gross settlement of $415,000.00.

    a.     Attached hereto as **Exhibit 1** is a true and correct copy of the fully-executed Settlement Agreement for Acosta's claims.

    b.     Attached hereto as **Exhibit 2** is a true and correct copy of the fully-executed Settlement Agreement for Alejandro's claims.

    c.     Attached hereto as **Exhibit 3** is a true and correct copy of the fully-executed Settlement Agreement for Barnella's claims.

    d.     Attached hereto as **Exhibit 4** is a true and correct copy of the fully-executed Settlement Agreement for Davila's claims.

    e.     Attached hereto as **Exhibit 5** is a true and correct copy of the fully-executed Settlement Agreement for Davis's claims.

    f.     Attached hereto as **Exhibit 6** is a true and correct copy of the fully-executed Settlement Agreement for Ely's claims.

///

g.      Attached hereto as **Exhibit 7** is a true and correct copy of the fully-executed Settlement Agreement for Gallo's claims.

h.      Attached hereto as **Exhibit 8** is a true and correct copy of the fully-executed Settlement Agreement for Gavel's claims.

i.      Attached hereto as **Exhibit 9** is a true and correct copy of the fully-executed Settlement Agreement for Guilmette's claims.

j.      Attached hereto as **Exhibit 10** is a true and correct copy of the fully-executed Settlement Agreement for Ingram's claims.

k.      Attached hereto as **Exhibit 11** is a true and correct copy of the fully-executed Settlement Agreement for James's claims.

l.      Attached hereto as **Exhibit 12** is a true and correct copy of the fully-executed Settlement Agreement for Jones's claims.

m.      Attached hereto as **Exhibit 13** is a true and correct copy of the fully-executed Settlement Agreement for Kelley's claims.

n.      Attached hereto as **Exhibit 14** is a true and correct copy of the fully-executed Settlement Agreement for Macklin's claims.

o.      Attached hereto as **Exhibit 15** is a true and correct copy of the fully-executed Settlement Agreement for McRae's claims.

p.      Attached hereto as **Exhibit 16** is a true and correct copy of the fully-executed Settlement Agreement for Pittman's claims.

q.      Attached hereto as **Exhibit 17** is a true and correct copy of the fully-executed Settlement Agreement for Sajous's claims.

r.      Attached hereto as **Exhibit 18** is a true and correct copy of the fully-executed Settlement Agreement for Scola's claims.

s.      Attached hereto as **Exhibit 19** is a true and correct copy of the fully-executed Settlement Agreement for Sosa's claims.

t.      Attached hereto as **Exhibit 20** is a true and correct copy of the fully-executed Settlement Agreement for Throckmorton's claims.

u.      Attached hereto as **Exhibit 21** is a true and correct copy of the fully-executed Settlement Agreement for Truehart's claims.

v.      Attached hereto as **Exhibit 22** is a true and correct copy of the fully-executed Settlement Agreement for Vazquez's claims.

w.      Attached hereto as **Exhibit 23** is a true and correct copy of the fully-executed Settlement Agreement for Zito's claims.

33.    Plaintiffs and Defendants disputed the number of shifts worked by Plaintiffs and Defendants' records had different amounts of shifts for each dancer. That played a role in weighing the value of each claim.

34.    Plaintiffs' counsel incurred $11,994.67 in costs that are being allocated evenly to the Plaintiffs. Plaintiffs' counsel has a lodestar of $214,377.50[1] and pursuant to the retainer agreements and the release signed by the Plaintiffs, their counsel are entitled to 45% of the settlement. Here, Plaintiffs' counsel, however, are merely seeking $186,750.00 in attorneys' fees, which is less than their lodestar. Plaintiffs' counsel litigated this case and was prepared to try this matter. The settlement amounts are significant amounts and take into account: the amount of time litigated, the ability to reach resolution and collect, which is relevant in this current unknown economic environment.

a.      Attached hereto as **Exhibit 24** is a true and correct copy of the billing entries for Kristensen LLP.

b.      Attached hereto as **Exhibit 25** is a true and correct copy of the costs for Kristensen LLP.

///

---

[1]   Plaintiffs' counsel worked with co-counsel Chip Muller of Muller Law, LLC in Rhode Island and Jarret L. Ellzey of Ellzey & Associates, PLLC in Texas. Had this matter progressed, Mr. Ellzey would have sought *pro hac vice* admission in this matter.

**DECLARATION OF JOHN P. KRISTENSEN IN SUPPORT OF**           **PAGE 10**
**PLAINTIFFS' MOTION FOR APPROVAL OF FLSA SETTLEMENT**

c.      Attached hereto as **Exhibit 26** is a true and correct copy of the billing entries for Ellzey & Associates, PLLC (formerly Hughes Ellzey, LLP).

d.      Attached hereto as **Exhibit 27** is a true and correct copy of the costs for Ellzey & Associates, PLLC (formerly Hughes Ellzey, LLP).

e.      Attached hereto as **Exhibit 28** is a true and correct copy of the billing entries and costs for Muller Law, LLC.

I declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on Friday, August 20, 2021 at Los Angeles, California.

*/s/ John P. Kristensen*
_____
John P. Kristensen

# EXHIBIT

# "5"

# IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF RHODE ISLAND

ARIEL MACKLIN on Behalf of Herself
and on Behalf of All Others Similarly
Situated,

       Plaintiff,

v.

BISCAYNE HOLDING CORP. d/b/a
WILD ZEBRA and CHRISTOPHER
VIANELLO,

       Defendants.

Civil Action No.: 1:19-cv-00561-WES

**COLLECTIVE ACTION**

**ORDER GRANTING PLAINTIFFS'
UNOPPOSED MOTION FOR
APPROVAL OF FLSA SETTLEMENT**

Complaint Filed: October 18, 2019

**ORDER GRANTING PLAINTIFFS'
UNOPPOSED MOTION FOR APPROVAL OF FLSA SETTLEMENT**

This Court, having considered Ariel Macklin, Sierra Acosta, Yalett Alejandro, Alicia Barnella, Kimberly Davila, Michaelia Davis, Nicole Ely, DeAnna Gallo, Shannon Gavel, Brittney Guilmette, Lashaunda Ingram, Elizabeth James, Deja Jones, Sancharae Kelley, Daizha Pittman, Natasha Sajous, Kaitlyn Scola, Chanel Sosa, Kaitlin Throckmorton, Alyssa Truehart, Jasmine Vazquez, and Shakiyla Zito (collectively, "Plaintiffs") (collectively, "Plaintiffs") Motion for Approval of FLSA Settlements, the declaration and supporting exhibits, and good cause appearing, the Court makes the following Order:

The Court finds the settlement to be fair and reasonable pursuant to the FLSA.

Therefore, the Court hereby **GRANTS** the Motion and rules as follows:

The Settlements amounting to a total of $415,000 are approved and $216,255.33 is allocated to Plaintiffs as detailed in the Settlement Agreements (Exhibits 1 through 23 of the Declaration of John P. Kristensen) and $186,750.00 in attorneys' fees are reasonable as are the $11,994.67 in costs.

**IT IS SO ORDERED.**

Dated: ___Sept. 24, 2021___

_____
Honorable William E. Smith
United States District Judge

# EXHIBIT
# "6"

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ALYSSA TRUEHART, an individual; BRIGGETTE MUNNIS, an individual; and on behalf of all others similarly situated, | ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) ) |
| DARTMOUTH CLUBS, INC. dba KING'S INN PREMIER GENTLEMEN'S CLUB, a Massachusetts Corporation; CRAIG J. CABRAL, an individual; CREEP DOE MANAGER, an individual; PAULIE DOE MANAGER, an individual; KIMBERLY DOE MANAGER, an individual; DOE MANAGERS 4-6; and DOES 7-10, inclusive, | ) ) ) ) ) ) ) ) ) ) |
| Defendants. | ) ) ) |

**Civil Action No.: 1:20-CV-10374-DJC**

**<u>COLLECTIVE ACTION</u>**

**DECLARATION OF JOHN P. KRISTENSEN IN SUPPORT OF PLAINTIFFS' MOTION FOR APPROVAL OF FLSA SETTLEMENT**

## DECLARATION OF JOHN P. KRISTENSEN

I, John P. Kristensen, hereby declare as follows:

1.     I am an attorney licensed to practice before all Courts in the State of California. I am the Managing Partner at Kristensen LLP, I have been admitted *Pro Hac Vice* in this matter as counsel of record for plaintiffs Alyssa Truehart ("Truehart"), Briggette Munnis ("Munnis"), Malkiah Cunningham ("Cunningham"), Sienna Barboza ("Barboza"), Michaelia Davis ("Davis"), Cassia DePaula ("DePaula"), Jessica Fernandez ("Fernandez"), Telecia Franklin ("Franklin"), Briana McCants Phan ("Phan"), Abigail Quintal ("Quintal"), Clarissa Sanchez ("Sanchez"), and Sabrina Wright ("Wright") (collectively, "Plaintiffs") in this action. I make this declaration of my own personal knowledge, and if called to testify, I could and would competently testify hereto under oath.

### THE SETTLEMENT

2.     On June 18, 2021, the Parties mediated with Dennis J. Calcagno After hours of negotiations, a settlement in principle was reached.

       a.  A true and correct copy of the fully executed Settlement Agreement and Release pertaining to Barboza's claims is attached hereto as **Exhibit 1**.

       b.  A true and correct copy of the fully executed Settlement Agreement and Release pertaining to Cunningham's claims is attached hereto as **Exhibit 2**.

       c.  A true and correct copy of the fully executed Settlement Agreement and Release pertaining to Davis's claims is attached hereto as **Exhibit 3**.

       d.  A true and correct copy of the fully executed Settlement Agreement and Release pertaining to DePaula's claims is attached hereto as **Exhibit 4**.

       e.  A true and correct copy of the fully executed Settlement Agreement and Release pertaining to Fernandez's claims is attached hereto as **Exhibit 5**.

       f.  A true and correct copy of the fully executed Settlement Agreement and Release pertaining to Franklin's claims is attached hereto as **Exhibit 6**.

g.  A true and correct copy of the fully executed Settlement Agreement and Release pertaining to McCants Phan's claims is attached hereto as **Exhibit 7**.

h.  A true and correct copy of the fully executed Settlement Agreement and Release pertaining to Munnis's claims is attached hereto as **Exhibit 8**.

i.  A true and correct copy of the fully executed Settlement Agreement and Release pertaining to Quintal's claims is attached hereto as **Exhibit 9**.

j.  A true and correct copy of the fully executed Settlement Agreement and Release pertaining to Sanchez's claims is attached hereto as **Exhibit 10**.

k.  A true and correct copy of the fully executed Settlement Agreement and Release pertaining to Truehart's claims is attached hereto as **Exhibit 11**.

l.  A true and correct copy of the fully executed Settlement Agreement and Release pertaining to Wright's claims is attached hereto as **Exhibit 12**.

3.  The allocations to the individual Plaintiffs are as follows:

| PLAINTIFF | GROSS SETTLEMENT AMOUNT |
| --- | --- |
| Alyssa Truehart | $50,000.00 |
| Briggette Munnis | $9,000.00 |
| Malkiah Cunningham | $8,000.00 |
| Sienna Barboza | $7,000.00 |
| Michaelia Davis | $3,000.00 |
| Cassia DePaula | $60,000.00 |
| Jessica Fernandez | $25,000.00 |
| Telecia Franklin | $45,000.00 |
| Briana McCants Phan | $20,000.00 |
| Abigail Quintal | $22,000.00 |
| Clarissa Sanchez | $25,000.00 |

| Sabrina Wright | $18,000.00 |
|---|---|
| **TOTAL** | **$292,000.00** |

Plaintiffs and Defendants disputed the number of shifts worked by Plaintiffs. That played a role in weighing the value of each claim.

4.      Plaintiffs' counsel incurred $11, 037.54 in costs that are being allocated evenly to the Plaintiffs.

5.      Plaintiffs' counsel incurred $11, 037.54 in costs that are being allocated evenly to the Plaintiffs. Plaintiffs' counsel has a lodestar of $156,799.50[1] and pursuant to the retainer agreements and the release signed by the Plaintiffs, their counsel are entitled to 45% of the settlement. Here, Plaintiffs' counsel, however, are merely seeking $131,400 in attorneys' fees, which is less than their lodestar. Plaintiffs' counsel litigated this case and was prepared to try this matter. The settlement amounts are significant amounts and take into account: the amount of time litigated, the ability to reach resolution and collect, which is relevant in this current unknown economic environment.

      a.      A true and correct copy of Kristensen LLP's billing entries invoice is attached hereto as **Exhibit 13**.

      b.      A true and correct copy of Kristensen LLP's costs invoice is attached hereto as **Exhibit 14**.

      c.      A true and correct copy of Ellzey & Associates, PLLC's billing entries is attached hereto as **Exhibit 15**.

      d.      A true and correct copy of Ellzey & Associates, PLLC's costs invoice is attached hereto as **Exhibit 16**.

      e.      A true and correct copy of Muller Law, LLC's billing entries is attached hereto as **Exhibit 17**.

---

[1]   Plaintiffs' counsel worked with co-counsel Chip Muller of Muller Law, LLC in Rhode Island and Jarret L. Ellzey of Ellzey & Associates, PLLC in Texas.

QUALIFICATIONS OF COUNSEL

6.     I am currently the Managing Partner at Kristensen LLP. I am an attorney licensed to practice in the state California.  I am admitted to practice before the United States District Courts for the Northern, Eastern, Southern, Central Districts of California, the United District Court for the District of Colorado, the United District Court for the Western and Eastern Districts of Wisconsin, the United States District Court for the Ninth Circuit Court of Appeals, and U.S. District Court for the District of Columbia.

7.     I graduated from Washington & Lee University School of Law in Lexington, Virginia in 2002 where I received an academic scholarship. Upon graduation, I moved back to Los Angeles and quickly gained admission to the California bar. I began my civil career at Daniels, Fine, Israel, Schonbuch & Lebovits, LLP in Century City. I then spent four years at a multi-disciplinary practice, Avila & Peros, LLP.

8.     In 2008, I accepted employment at a firm, O'Reilly & Danko, which subsequently changed its name to O'Reilly || Collins. The firm was one of the preeminent plaintiffs' law firms in the country obtaining numerous seven and eight figure verdicts and settlements during my tenure.

9.     In 2011, I was responsible for a then record and maximum fine against an automotive company after I requested the federal government investigate an auto-manufacturer for its statements regarding why it was conducting a recall overseas, but not for similar vehicles in the United States. The manufacturer paid the maximum fine in excess of $16,000,000.00 as a result of my investigation.

10.     In 2011, the Daily Journal selected me as one of five associates to watch in the state of California in its annual 20 under 40 edition. I was the sole plaintiffs' attorney to receive the accolade. I have also been named to Super Lawyers' Rising Stars for Southern California in 2012, 2013 and 2014. I have been named a Super Lawyer for Southern California every year since.

11.     I have tried employment and wrongful death trials and obtained numerous million

dollar settlements for my clients, including against an exotic dance club. Our firm has tried multiple cases over the last five years and was prepared to take this matter to trial as well.

12.     I have litigated against NBC, Enterprise Rent-A-Car, Spearmint Rhino, Ford Motor Company, Toyota Motor Company, General Motors, Taco Bell, Sony and numerous other large corporations. My practice has included in multiple appellate cases where I have argued successfully before the California Courts of Appeal.

13.     During the course of the Toyota Sudden Acceleration litigation, I was appointed by Hon. Anthony J. Mohr to the Plaintiffs' Steering Committee and was re-appointed in 2012 by Hon. Lee Edmon. Judge Edmon also appointed me as a member of the national fee committee to recommend the allocations and disbursements of the common benefit fund.

14.     In 2012, I took a position with one of the nation's top Class Action law firms, Strange & Carpenter, where I was instrumental in preparing one of the bellwether sudden acceleration cases that resolved in December 2012. That case was a model for the California class claim that resolved along with the national case. Today, I remain in the role as the youngest attorney appointed to the plaintiffs' steering committees in the California Toyota Sudden Acceleration cases.

15.     In 2017, I obtained what was then a record Title IX settlement against UC Regents.

16.     I was appointed Class Counsel in the matter of *Mankin v. Mountain West Research Center, L.C.*, Case Number 2:13-cv-06447-DSF-AGR in the Central District of California. The class settlement in that matter was approved by Hon. Dale S. Fischer.

17.     I was appointed Class Counsel in the matter of *Kim v. Tinder, Inc., et al.*, Case Number  2:18-cv-03093-JFW-AS in the Central District of California. The class settlement in that matter was approved by the Court who also approved our request for attorney's fees and my rate at $725.00 an hour.

18.     On August 7, 2019, I was appointed Class Counsel in the matter of *George v. Shamrock Saloon II, LLC*, Case Number 17-cv-6663 (RA) (HBP) in the Southern District of New

York by Magistrate Judge Pitman. Class certification was contested and an objection on the class certification, not my qualifications, was made to Hon. Ronnie Abrams, who adopted Magistrate Judge Pitman's report and recommendations in its entirety.

19.    On October 23, 2019, in a contested motion for class certification in the Central District of California, Hon. George H. Wu, appointed me as class counsel in the matter of *Lisa Friedman v. Jillian Michaels, et al.*, No. 19-cv9414-GW(SSx) in the Central District of California.

20.    Other than myself, several members of my firm have knowledge of this case and have worked on this case with me with my oversight. I am noted in my firm's billing entries as "JK."

21.    Jesenia A. Martinez, an Associate at my firm, has also worked on this case. Jesenia attended Tufts University for her undergraduate degree and attended Southwestern University School of Law, graduating from its prestigious SCALE accelerated program in May 2017. While in law school, Jesenia completed externships with Judge Kim McLane Wardlaw at the United States Court of Appeals for the Ninth Circuit and Judge Dean D. Pregerson at the United States District Court for the Central District of California. Jesenia was also part of Law Review and was a Dean's Fellow and Teaching Assistant while in law school where she earned several CALI and Witkin awards for excellence. She began working at Kristensen LLP after taking the bar. Jesenia is noted in the firm's billing entries as "JM" and her hourly rate is $350.00 an hour.

22.    Jacob J. Ventura, an Associate at my firm until the fall of 2020, had also worked on this case. Jacob attended the University of Massachusetts Dartmouth for his undergraduate degree and attended Washington and Lee University School of Law. While in law school, Jacob completed clerkships with the Rhode Island Supreme Court as well as for the Honorable Judge Diane Finkle of the U.S. Bankruptcy Court District of Rhode Island. Jacob also completed externships with the U.S. House of Representatives Judiciary Committee, and for attorney Peter Robinson, Defense Counsel at the International Criminal Tribunal (former Yugoslavia). He began working at Kristensen LLP in 2019 after clerking for a real estate firm in Massachusetts. Jacob is

noted in the firm's billing entries as "JV" and his hourly rate is $300.00 an hour.

23.     Alejandro Marin, an Associate at our firm when began on October 2020, also worked on this case. Alejandro attended obtained his JD from UC Davis in 2019. He began working at Kristensen LLP in October 2020 after clerking with Judge Dennis M. Cota at the U.S. District Court for the Eastern District of California. Alejandro is noted in the firm's billing entries as "AM" and his hourly rate is $250.00 an hour.

24.     Jenny Mitchell joined the firm in October 2018 as a paralegal. In February 2019 she achieved her Paralegal Accreditation with distinction through UCLA – an ABA accredited program. She received her undergraduate degree from Vassar College and a Masters from Seattle University. She has over two decades of writing, research and process improvement experience. Jenny is noted in the firm's billing entries as "JM" and her hourly rate is $125.00 an hour.

25.     Emma Salmon joined the firm in November 2020 as a legal assistant and had prior experience in the health care field. She obtained her Bachelor's degree in English in 2018 from UC Santa Barbara. Emma is noted in the firm's billing entries as "ES" and her hourly rate is $125.00 an hour.

26.     Juliana Villalobos joined the law firm in August 2019 as a legal assistant. She graduated UC Davis with a Bachelors in International Relations with an emphasis on Arab Studies and International Law. She is currently enrolled in the University of Arizona's Masters of Law online program. Prior to working at the firm, she was a legal intern in Washington D.C. for the Washington Lawyers Committee, she interned at SEIU Local 1000 a union in Sacramento, and worked as an accountant part time. Juliana is noted in the firm's billing entries as "JV" and her hourly rate was $125.00 an hour.

27.     Luz Portillo joined the firm in February 2017 as a legal assistant/paralegal. She previously worked in the legal sector for two years prior to joining our firm. In December of 2015, she obtained her Bachelor's degree in Politics and Latin American and Latino Studies from UC Santa Cruz.  Luz is noted in the firm's billing entries as "LP" and her hourly rate was $125.00 an

hour.

28.    Kenia Aguilar joined the firm in October 2019 as an office assistant. She is planning to continue her studies to receive an AA + Cert. in Business Administration from LBCC. Kenia is noted in the firm's billing entries as "KA" and her hourly rate was $125.00 an hour.

29.    Jarrett L. Ellzey has been a litigator since his career began in 2003 when he graduated from South Texas College of Law in Houston, Texas. Since the beginning of his career, Jarrett has represented plaintiffs and defendants in matters ranging from simple breach of contract cases involving two small businesses, to nationwide consumer class actions in state and federal courts across the nation, including Texas, California, Florida, New York, Illinois, Pennsylvania, Georgia, Oklahoma, and Mississippi.

30.    Since Hughes Ellzey, LLP opened in 2010, Jarrett and his partner Craft Hughes have tried dozens of cases and, during only a five-year stretch, succeeded in obtaining over $23 million in verdicts. Jarrett served as lead counsel for the plaintiff in a commercial real estate dispute winning one of the largest fraud verdicts in Texas, earning him and the firm honoree distinction in the Texas Verdict Hall of Fame by Texas Lawyer VerdictSearch and recognition for one of the largest civil awards in Texas in 2012. Hughes Ellzey, LLP is now Ellzey & Associates, PLLC. Had this matter proceeded to trial, Jarrett would have sought *pro hac vice* admission. Jarrett's hourly rate is $725.00 and he uses the initials "JE."

31.    In addition, Alice Newlin and Victoria Morales of Hughes Ellzey provided paralegal support for their work on this matter. Alice uses the initials "AN" and Victoria uses the initials "VM." Both Alice and Victoria's hourly rates are $150.00.

32.    Leigh S. Montgomery, an attorney with Ellzey & Associates, PLLC, has spent her entire legal career helping individuals and small businesses maximize the results they can achieve from the civil justice system since 2008 when she graduated from Baylor University Law School in Waco, Texas. Leigh spent the first five years of her career assisting those individuals and businesses devastated by natural catastrophes such as Hurricane Ike and Hurricane Harvey. She is

**DECLARATION OF JOHN P. KRISTENSEN IN SUPPORT OF**          **PAGE 9 OF 10**
**PLAINTIFFS' MOTION FOR APPROVAL OF FLSA SETTLEMENT**

Case 2:21-cv-00692-BHL   Filed 10/20/21   Page 49 of 100   Document 22-1

proud to have assisted hundreds of individuals and small businesses in getting the money and assistance necessary to put their lives back together.

33.     Since 2013, Leigh has represented individuals injured in truck, auto or on the job incidents. With her background in fighting insurance companies, she has helped many injured individuals get the maximum benefits and help they deserve. Leigh's hourly rate is $450.00 and she uses the initials "LM."

34.     Ghazzaleh Rezazadeh, an attorney with Ellzey & Associates, PLLC, has been a litigator since 2010 and has represented both plaintiffs and defendants. She spent the majority of her career representing individuals and small businesses who sustained catastrophic damage to their homes and businesses as a result of hurricanes and other catastrophic events. Ghazzaleh is a highly skilled legal writer with significant experience preparing all manner of arguments and briefs to be presented to both trial and appellate courts. She enjoys using her passion for written word and keen analytical eye to zealously advocate for her clients. She obtained her undergraduate degree in 2006 from Southern Methodist University and her law degree from South Texas College of Law in 2009. Ghazzaleh's hourly rate is $375.00 and she uses the initials "GR."

35.     Chip Muller, graduated from Middlebury College, B.A., 1993. He obtained his Master's Degree from Boston University and his J.D. from the University of North Carolina School of Law. He is admitted to practice in Rhode Island, Massachusetts, and Connecticut. Chip's hourly rate is $300.00 an hour. Chip's paralegal, Donna Hayden assisted in this matter. Donna's hourly rate is $65.00 an hour.

I declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on Wednesday, August 11, 2021 at Los Angeles, California.

/s/ John P. Kristensen
_____
John P. Kristensen

<u>**CERTIFICATE OF SERVICE**</u>

      I certify that on Wednesday, August 11, 2021, a true and correct copy of the attached **DECLARATION OF JOHN P. KRISTENSEN IN SUPPORT OF PLAINTIFFS' MOTION FOR APPROVAL OF FLSA SETTLEMENT** was served via CM/ECF on all participants of record upon the following parties pursuant to Fed. R. Civ. P. 5:

  Patrick T. Matthews, Esq.
  B.B.O.# 629498
  Brian M. Tavares
  B.B.O.# 685949
  Coastal Legal Affiliates, P.C.
  P.O. Box 1870
  Fall River, MA 02722
  Tel: (508) 676-6900
  Fax: (508) 676-9908
  Email:
  ptmatthews@fallriverattorneys.com
  btavares@fallriverattorneys.com

*Counsel for Defendants*

                                            */s/ John P. Kristensen*
                                            John P. Kristensen

# EXHIBIT "7"

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ALYSSA TRUEHART, an individual; BRIGGETTE MUNNIS, an individual; and on behalf of all others similarly situated,<br><br>     Plaintiffs,<br><br>v.<br><br>DARTMOUTH CLUBS, INC. dba KING'S INN PREMIER GENTLEMEN'S CLUB, a Massachusetts Corporation; CRAIG J. CABRAL, an individual; CREEP DOE MANAGER, an individual; PAULIE DOE MANAGER, an individual; KIMBERLY DOE MANAGER, an individual; DOE MANAGERS 4-6; and DOES 7-10, inclusive,<br><br>     Defendants. | **Civil Action No.: 1:20-CV-10374-DJC**<br><br>**<u>COLLECTIVE ACTION</u>**<br><br><br>**ORDER GRANTING PLAINTIFFS' MOTION FOR APPROVAL OF FLSA SETTLEMENT** |

This Court, having considered plaintiffs Alyssa Truehart, Briggette Munnis, Malkiah Cunningham, Sienna Barboza, Michaelia Davis, Cassia DePaula, Jessica Fernandez, Telecia Franklin, Briana McCants Phan, Abigail Quintal, Clarissa Sanchez, and Sabrina Wright (collectively, "Plaintiffs") Motion for Approval of FLSA Settlements, the brief, declaration and supporting exhibits, and good cause appearing, the Court makes the following Order:

The Court finds the settlement to be fair and reasonable pursuant to the FLSA.

Therefore, the Court hereby **GRANTS** the Motion and rules as follows:

The Settlements amounting to a total of $292,000 are approved and $149,562.46 is allocated to Plaintiffs as detailed in the Settlement Agreements (Exhibits 1-12 of the Declaration of John P. Kristensen) and $131,400 in attorneys' fees are reasonable as are the $11,037.54 in costs.

**IT IS SO ORDERED.**

Dated:   October 1, 2021                              _____
                                                                       Honorable Denise J. Casper
                                                                       United States District Judge

## CERTIFICATE OF SERVICE

I certify that on Wednesday, September 29, 2021, a true and correct copy of the attached **ORDER GRANTING PLAINTIFFS' MOTION FOR APPROVAL OF FLSA SETTLEMENT** was served via CM/ECF on all participants of record upon the following parties pursuant to Fed. R. Civ. P. 5:

Patrick T. Matthews, Esq.
B.B.O.# 629498
Brian M. Tavares
B.B.O.# 685949
Coastal Legal Affiliates, P.C.
P.O. Box 1870
Fall River, MA 02722
Tel: (508) 676-6900
Fax: (508) 676-9908
Email:
ptmatthews@fallriverattorneys.com
btavares@fallriverattorneys.com

***Counsel for Defendants***

_/s/ John P. Kristensen_
John P. Kristensen

# EXHIBIT

## "8"

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WISCONSIN**

| | |
|---|---|
| DEBRA WEISS, individually and on behalf of all others similarly situated, | ) )<br>) **Case No.: 3:20-cv-00990-slc** |

DEBRA WEISS, individually and on behalf of
all others similarly situated,                  )
                                                )    **Case No.: 3:20-cv-00990-slc**
                                                )
          Plaintiff,                            )    **COLLECTIVE ACTION**
                                                )
                                                )    **DECLARATION OF JOHN P.**
v.                                              )    **KRISTENSEN IN SUPPORT OF**
                                                )    **PLAINTIFF'S UNOPPOSED**
1709 CORPORATION. dba SHOWTIME                  )    **MOTION FOR APPROVAL OF**
GENTLEMEN'S CLUB, a Wisconsin                   )    **FLSA SETTLEMENT**
Corporation; THOMAS G. YOUTSOS, an              )
individual; and DOES 1 through 10, inclusive,   )    Complaint Filed: October 28, 2020
                                                )
          Defendants.                           )
                                                )
                                                )
                                                )
                                                )
                                                )
                                                )
_____        )

I, John P. Kristensen, declare:

1.      I am an attorney licensed to practice before all Courts in the State of California. I

am the Managing Partner at Kristensen LLP, Counsel of record for Plaintiff Debra Weiss

("Plaintiff" or "Weiss") in this action. I make this declaration of my own personal knowledge,

and if called to testify, I could and would competently testify hereto under oath.

**QUALIFICATIONS OF COUNSEL**

2.      I am currently the Managing Partner at Kristensen LLP. I am an attorney licensed

to practice in the State of California.  I am admitted to practice before the United States District

Courts for the Northern, Eastern, Southern, Central Districts of California, the United States

District Court for the District of Colorado, the United States District Courts for the Eastern and

Western District of Wisconsin and the United States District Court for the District of Columbia.

3.      I graduated from Washington & Lee University School of Law in Lexington, Virginia in 2002 where I received an academic scholarship. Upon graduation, I moved back to Los Angeles and quickly gained admission to the California bar. I began my civil career at Daniels, Fine, Israel, Schonbuch & Lebovits, LLP in Century City. I then spent four years at a multi-disciplinary practice, Avila & Peros, LLP.

4.      In 2008, I accepted employment at a firm, O'Reilly & Danko, which subsequently changed its name to O'Reilly || Collins. The firm was one of the preeminent Plaintiff's law firms in the country obtaining numerous seven and eight figure verdicts and settlements during my tenure.

5.      In 2011, I was responsible for a then record and maximum fine against an automotive company after I requested the federal government investigate an auto-manufacturer for its statements regarding why it was conducting a recall overseas, but not for similar vehicles in the United States. The manufacturer paid the maximum fine in excess of $16,000,000.00 as a result of my investigation.

6.      In 2011, the Daily Journal selected me as one of five associates to watch in the state of California in its annual 20 under 40 Edition. I was the sole Plaintiff's attorney to receive the accolade. I have also been named to Super Lawyers' Rising Stars for Southern California in 2012, 2013 and 2014. I have been named a Super Lawyer for Southern California every year since.

7.      I have tried employment and wrongful death trials and obtained numerous million dollar settlements for my clients, including against an exotic dance club. Our firm has tried multiple cases over the last five years and was prepared to take this matter to trial as well.

8.      I have litigated against NBC, Enterprise Rent-A-Car, Spearmint Rhino, Ford Motor Company, Toyota Motor Company, General Motors, Taco Bell, Sony and numerous other large corporations. My practice has included in multiple appellate cases where I have argued successfully before the California Courts of Appeal.

9.      During the course of the Toyota Sudden Acceleration litigation, I was appointed by Hon. Anthony J. Mohr to the Plaintiff's Steering Committee and was re-appointed in 2012 by Hon. Lee Edmon. Judge Edmon also appointed me as a member of the national fee committee to recommend the allocations and disbursements of the common benefit fund.

10.     In 2012, I took a position with one of the nation's top Class Action law firms, Strange & Carpenter, where I was instrumental in preparing one of the bellwether sudden acceleration cases that resolved in December 2012. That case was a model for the California class claim that resolved along with the national case. Today, I remain in the role as the youngest attorney appointed to the Plaintiff' steering committees in the California Toyota Sudden Acceleration cases.

11.     In 2017, I obtained what was then a record Title IX settlement against UC Regents.

12.     I was appointed Class Counsel in the matter of *Mankin v. Mountain West Research Center, L.C*., Case Number 2:13-cv-06447-DSF-AGR in the Central District of California. The class settlement in that matter was approved by Hon. Dale S. Fischer.

13.     I was appointed Class Counsel in the matter of *Kim v. Tinder, Inc., et al.*, Case Number  2:18-cv-03093-JFW-AS in the Central District of California. The class settlement in that matter was approved by the Court who also approved our request for attorney's fees and my rate at $725.00 an hour.

14.     On August 7, 2019, I was appointed Class Counsel in the matter of *George v. Shamrock Saloon II, LLC*, Case Number 17-cv-6663 (RA) (HBP) in the Southern District of New York by Magistrate Judge Pitman. Class certification was contested and an objection on the class certification, not my qualifications, was made to Hon. Ronnie Abrams, who adopted Magistrate Judge Pitman's report and recommendations in its entirety.

15.     On October 23, 2019, in a contested motion for class certification in the Central District of California, Hon. George H. Wu, appointed me as class counsel in the matter of *Lisa Friedman v. Jillian Michaels, et al.*, No. 19-cv9414-GW(SSx) in the Central District of California.

16.     Other than myself, several members of my firm have knowledge of this case and have worked on this case with me with my oversight. I am noted in my firm's billing entries as "JPK."

17.     Jesenia A. Martinez, an Associate at my firm, has also worked on this case. Jesenia attended Tufts University for her undergraduate degree and attended Southwestern University School of Law, graduating from its prestigious SCALE accelerated program in May 2017. While in law school, Jesenia completed externships with Judge Kim McLane Wardlaw at the United States Court of Appeals for the Ninth Circuit and Judge Dean D. Pregerson at the United States District Court for the Central District of California. Jesenia was also part of Law Review and was a Dean's Fellow and Teaching Assistant while in law school where she earned several CALI and Witkin awards for excellence. She began working at Kristensen LLP after taking the bar. Jesenia is noted in the firm's billing entries as "JAM" and her hourly rate is $375.00 an hour.

///

18.     Alejandro Marin, an Associate at my firm who began on October 2020, also worked on this case. Alejandro obtained his JD from UC Davis in 2019. He began working at Kristensen LLP in October 2020 after clerking with Judge Dennis M. Cota at the U.S. District Court for the Eastern District of California. Alejandro is noted in the firm's billing entries as "AM" and his hourly rate is $275.00 an hour.

19.     Jenny Mitchell joined the firm in October 2018 as a paralegal. In February, 2019 she achieved her Paralegal Accreditation with distinction through UCLA – an ABA accredited program. She received her undergraduate degree from Vassar College and a Masters from Seattle University. She has over two decades of writing, research and process improvement experience. Jenny is noted in the firm's billing entries as "JM" and her hourly rate is $125.00 an hour.

### THE SETTLEMENT

20.     The parties in this matter have executed a Settlement Agreement.

a.      I have attached hereto as **Exhibit 1** a true and correct copy of the Settlement Agreement pertaining to Weiss's claims.

21.     Plaintiff was an exotic dancer at Defendants' club, Showtime Gentlemen's Club.

22.     As this Court was aware, the Parties actively engaged in discovery, there was a motion for notice pursuant to 29 U.S.C. § 216(b), and daily litigation for over half a year. After various communications between the Parties' respective counsel, the Parties reached the resolution as described in the Agreement for which they are now seeking approval.

23.     Plaintiff was an exotic dancer at Showtime Gentlemen's club in Wausau, Wisconsin within the three years prior to the filing of the lawsuit.

24.     Plaintiff differentiated five types of claims. The first two were for failure to pay minimum wage or overtime pursuant to 29 U.S.C. §§ 206 and 207.

25.     Third, Plaintiff contends that dancers were charged house fees to work, fees which were illegal kickbacks pursuant to 29 C.F.R. § 531.35.

26.     Plaintiff also had claims for two types of tipping violations. First, the dancers were "encouraged" to tip the DJs, daily managers and security. The forced tipping, Plaintiff contends, is also a violation of 29 C.F.R. § 531.35, as it results in the dancers subsidizing the clubs' payment of wages to other employees. The second form of claimed damages for tips was the unlawful taking of monies received for individual private dances to customers, a portion of which was retained by Defendants rather than being paid to Plaintiff. Defendants maintain these fees were fees charged by them and belonging to them. Plaintiffs allege these were tips that belonged to them and were improperly taken.

27.     Thus, when Plaintiff litigated this matter, there were four to five levels of claimed damages for each dancer that went into the valuation of the claims. There was also substantial debate regarding the number of shifts or dates Plaintiff worked.

28.     Defendants disagree with Plaintiff's factual assertions.

29.     Under the Agreement, Defendants have agreed to pay Plaintiff a gross settlement of $15,000. The settlement amount shall be paid no later than three (3) business days after the Agreement has been approved by the District Court, and an executed W-9 from Plaintiff's counsel has been produced. Payment shall be in the form of a check in the amount of $15,000.00 to be issued to Kristensen Weisberg, LLC CA IOLTA Account. The amount allocated to attorneys' fees is six thousand seven hundred fifty dollars ($6,750.00). $477.25 is allocated to costs. Plaintiff's allocation is $7,772.75[1].

---

[1]     The Agreement allocates $652.25 in costs. However, the allocation as expressed in ¶ 29 reflects a more accurate distribution as Plaintiff's counsel is only seeking reimbursement for $477.25 in costs. *See* Kristensen Decl. ¶ 33, Ex. 2.

30.     During the relevant period, Weiss worked at Showtime from approximately Spring, 2017 to Winter, 2019.  During this period, she would work three to four nights per week, or approximately 15 days a month at Showtime over this time period. Hurley worked for approximately 15 shifts a month for 16 months, which is 240 shifts. Plaintiff's counsel anticipated that her damages, had the case proceeded to trial, be in the $25,000 range.

31.     Despite, Defendants claims about the statute of limitations, Plaintiff's claims were from October 2017 to December 2019. Plaintiff possessed documentary evidence of working at Showtime during the disputed period.

32.     Defendants contested the evidence and disagreed with Plaintiff's factual assertions.

33.     Plaintiff's counsel incurred $477.25 in costs. Plaintiff's counsel has a lodestar of at least $14,070 and pursuant to the retainer Agreement and the release signed by Plaintiff, her counsel are entitled to 45% of the settlement. Mr. Urban's hours are not even in the $14,070 figure, and if allocated would likely increase the loadstar to approximately $20,000.

        a.      I have attached hereto as **Exhibit 2** is a true and correct copy of the Kristensen LLP time entries and costs invoices.

34.     Plaintiff's counsel litigated this case extensively. The settlement amount takes into account the amount of time litigated and the ability to reach resolution and collect, which is relevant in this current unknown economic environment.

35.     In exchange for the consideration described above, Plaintiff has agreed to dismiss her causes of action for alleged violations of the FLSA and any state wage and hour claims stemming from Plaintiff's employment with the Defendants at issue in the Complaint.

///

36.     The Court should approve the settlement because it reflects a reasonable compromise of bona fide dispute regarding Defendants' alleged FLSA liability. There was no collusion in reaching the Agreement. The Parties were adequately represented by competent counsel experienced in litigating cases under the FLSA, and the Agreement reached was the result of good-faith negotiation between the Parties. I have tried multiple employment cases and obtained substantial settlements against employers, including against another exotic dance club in excess of a million dollars. I have been appointed class counsel, including three times in 2019 alone.

37.     The Parties have strenuously different opinions about the classification of the dancers as employees or independent contractors and whether the dance fee charged by and collected by the Defendants belonged to the Defendants or was a tip belonging to the Plaintiff. The Parties engaged in discovery, including the production of documents, as well as a motion for notice pursuant to section 216(b) of the FLSA. Counsel were cognizant and aware of each other's arguments and positions pertaining to employee classification. The Parties defended their positions about the disputed aspects of the case and a resolution was reached.

38.     Had this matter proceeded to trial, the damages awarded were within the ballpark of the settlement amount and are all within the reasonable percentage. The risk for Defendants was that in a fee-bearing case, with a real likelihood of liability, the attorneys' fees would dwarf the damages.

39.     The Agreement reflects a considerable award to Plaintiff. Counsel spent considerable time litigating the matter which is evidenced in the lodestar of at least $14,070. Plaintiff's counsel's skill, tenacity and the potential of a large attorneys' fees award contributed to the overall settlement. This settlement is very favorable to Plaintiff and in light of the work

performed in the lawsuit and the juncture of the settlement in the litigation, the settlement

amount is reasonable. Plaintiff's counsel loadstar exceeds the requested fee by nearly $7,000.

40. The Parties had engaged in written discovery, document production, and motion

practice by the time settlement discussions took place. As the Court is aware, the Parties had

fully briefed Plaintiff's motion for issuance of notice pursuant to section 216(b) of the FLSA.

The settlement is the result of extensive pre-suit investigation, review of formal and informal

discovery, and substantial arm's-length negotiation between counsel. The Parties had a good

understanding of the merits of their positions, which led to the settlement reached.

41. Courts will approve an FLSA settlement when there is a significant risk that

litigation could result in a lower recovery for the class or no recovery at all. Several facts in this

case potentially jeopardize Plaintiff's recovery should this case proceed to trial, including

Defendants' written employment policies, claims that Plaintiff did not work at Showtime within

the statutory period, and Plaintiff's potential inability to prove that Defendants' alleged violations

were willful. Accordingly, further litigation might result in Plaintiff recovering less than the

Settlement or perhaps nothing at all, so this factor weighs in favor of approving the FLSA

settlement. The financial effects of Covid-19 and the ability to collect were concerns for

Plaintiff.

42. Plaintiff's counsel have substantial experience litigating wage and hour cases and

handling complex and class actions. Counsel for the Parties knew the strengths and weaknesses

of the opposing side's case as can be evidenced by the fully briefed motions before the Court.

Plaintiff's counsel's substantial experience and judgment resulted in this extraordinary

Settlement. Additionally, Plaintiff has been made aware of the terms of the settlement and has

signed the settlement agreement. Accordingly, this factor weighs in favor of approval.

Declaration of John P. Kristensen                                                                                   Page 9
in Support of Motion for Approval of FLSA Settlement
Case 2:21-cv-00692-BHL   Filed 10/20/21   Page 65 of 100   Document 22-1

43.     The proposed Settlement was the result of extensive pre-suit investigation, review of formal and informal discovery, and substantial arm's-length negotiations between counsel. While Plaintiff's counsel is receiving payment of reimbursable costs and attorneys' fees from the Settlement, there is nothing out of the ordinary in this arrangement. This factor therefore weighs in favor of approval.

44.     Concurrently with this Motion, Plaintiff's counsel will submit detailed billing entries demonstrating that a substantial amount of time and resources was needed to achieve this result revealing a lodestar amount of $14,070. As such, Plaintiff's counsel is merely requesting a negative multiplier of 0.5 and seeking roughly $7,000 less than their lodestar to reach the 45% agreement each Plaintiff agreed to in their retainer agreement and which is noted in the Settlement Agreement signed by Plaintiff. Further, this was a hard-fought case with experienced opposing counsel who were ready to try this case on the merits in trial (or arbitration), which would have exponentially increased the amount of attorneys' fees sought.

45.     Plaintiff's counsel took this case on a contingency fee basis facing uncertainty as to whether any recovery would be achieved at Plaintiff's counsel's cost. Plaintiff spent considerable time and effort litigating this matter in good faith with the possibility of no recovery, which is oftentimes common in contingency fee cases. It is widely known that in some cases there is no recovery while in others there is a recovery and a multiplier on counsel's lodestar. The fact that Plaintiff's counsel's experience and time resulted in this extraordinary settlement emphasizes that to the extent a lodestar analysis would yield a lower figure, downward adjustment of the lodestar amount of 0.5x to reflect the 45% contingency fee pursuant to Plaintiff's retainer Agreement of attorney's fees and costs is reasonable and appropriate. Thus, the proposed allocation of attorney's fees does not undermine the fairness or reasonableness of

the amounts received by Plaintiff for purposes of this FLSA settlement.

I declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on Friday, May 28, 2021 at Los Angeles, California.

/s/ *John P. Kristensen*
_____
John P. Kristensen

<u>**CERTIFICATE OF SERVICE**</u>

I certify that on Friday, May 28, 2021, the foregoing document titled **DECLARATION OF JOHN P. KRISTENSEN IN SUPPORT OF PLAINTIFF'S UNOPPOSED MOTION FOR APPROVAL OF FLSA SETTLEMENT** and the accompanying documents were served via CM/ECF upon the following parties pursuant to Rule 5 of the FEDERAL RULES OF CIVIL PROCEDURE:

Geoffrey S. Trotier
Beth J. Kushner
**VON BRIESEN & ROPER, S.C.**
411 East Wisconsin Avenue, Suite 1000
Milwauee, Wisconsin 53202
Email: gtrotier@vonbriesen.com
Email: bkushner@vonbriesen.com

*Counsel for Defendants*

*/s/ John P. Kristensen*
John P. Kristensen

# EXHIBIT

# "9"

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

DEBRA WEISS, individually and
on behalf of all others similarly situated,

OPINION and ORDER

Plaintiff,

20-cv-990-slc

v.

THOMAS YOUTOS and 1709 CORPORATION,
d/b/a SHOWTIME GENTLEMEN'S CLUB,

Defendants.

---

Plaintiff Debra Weiss brings a collective action claim against defendants Thomas Youtos and 1709 Corporation d/b/a Showtime Gentlemen's Club, seeking to recover wages owed to her and other dancers at the club under the Fair Labor Standards Act (FLSA), 29 U.S.C. § 201-219. On February 26, 2021, Weiss filed a motion for conditional certification of a FLSA collective action, dkt. 13, but before briefing was completed on that motion, Weiss notified the court that the parties had reached a settlement agreement with respect to her individual claims, dkt. 20. On May 28, 2021, Weiss filed an unopposed motion for approval of the settlement agreement, which is now before the court.  Dkt. 22.

For the reasons below, I will approve the settlement agreement regarding Weiss's individual claims and deny as moot Weiss's earlier-filed motion for conditional certification of a collective action.

## BACKGROUND

From 1998 until December 2019, plaintiff Debra Weiss worked as an exotic dancer at Showtime Gentlemen's Club, which is owned and operated in Wausau, Wisconsin by defendants

1709 Corporation and Thomas Youtsos.  On October 28, 2020, she brought this action on behalf of herself and other dancers at the club, alleging that between October 2017 and December 2019, defendants improperly classified its dancers as independent contractors, failed to pay them minimum and overtime wages in violation of 29 U.S.C. §§ 206 and 207, required the dancers to pay fees to the club (illegal kickbacks), to share their tips with other employees in violation of 29 C.F.R. § 531.35, and to relinquish certain tips to the club in violation of 29 U.S.C. § 203.  Defendants denies these allegations and also argues that the FLSA does not apply because Showtime's annual gross sales during the applicable time period was less than the $500,000 jurisdictional requirement.

While briefing Weiss's motion for conditional certification, the parties reached a settlement totaling $15,000 for Weiss's individual claims.  Under the agreement, defendants agree to pay Weiss a gross settlement of $15,000 no later than three business days after the agreement has been approved by this court and Weiss has produced an executed W-9.  The amount allocated to attorneys' fees is $6,750.00, and $477.25 is allocated to costs.[1]  Weiss's allocation is $7,772.75.  In exchange, Weiss has agreed to dismiss her causes of action for alleged violations of the FLSA and any state wage and hour claims stemming from her employment.

## OPINION

The parties seek approval of their settlement agreement, as required in cases brought under the FLSA.  *See Walton v. United Consumers Club, Inc.*, 786 F.2d 303, 306 (7th Cir. 1986).  Although there is no collective or class in this case, this court has held that it  must review an

---

[1]  The agreement allocates $652.25 in costs, but Weiss's counsel is seeking reimbursement only for $477.25 in costs.

2

FLSA settlement to determine whether it represents "a fair and reasonable resolution of a bona fide dispute over FLSA provisions" and reflects a "compromise of disputed issues [rather] than a mere waiver of statutory rights brought about by an employer's overreaching." *Butz v. Automation Sols. of Am., Inc.*, No. 16-cv-696-jdp, 2017 WL 5713986, at *1 (W.D. Wis. Nov. 7, 2017) (citing *Lynn's Food Stores, Inc. v. U.S. Dep't of Labor*, 679 F.2d 1350, 1354-55 (11th Cir. 1982)); *see also Vallin v. Dabdoub Cleaning Services, Inc.*, No. 20-cv-550-jdp, dkt. 13 (W.D. Wis. Nov. 20, 2020).  The FLSA also requires that a settlement agreement include an award of reasonable fees.  *See* 29 U.S.C. § 216(b) ("The court in such action shall, in addition to any judgment awarded to the plaintiff or plaintiffs, allow a reasonable attorney's fee to be paid by the defendant, and the costs of the action").

Here, the court is persuaded that the parties' proposed settlement represents a fair and reasonable resolution of a bona fide dispute under the FLSA.  Weiss says that if her claims had proceeded to trial, her damages would be in the range of $25,000 for the 240 shifts she worked during the relevant period, and her attorneys have a lodestar (hourly fees of $725, $375, and $250 multiplied by number of hours) in the range of $14,000 to $20,000 for the time spent on Weiss's case to date.  The parties reached a settlement of $15,000 ($7,772.75 in damages, $6,750 in fees, and $477.25 in costs) in light of factual disputes about the number of shifts Weiss worked, whether the dancers should be classified as employees versus independent contractors, and defendants' jurisdictional defense.  In addition, the parties say that the potential for additional opt in plaintiffs, the effects of the COVID-19 pandemic on the club, and defendants' lack of insurance coverage played a substantial role in their decision to settle.

Weiss's counsel's request for a fee award totaling 45% of the settlement value plus $477.25 in costs is likewise reasonable.  Kristensen LLP's billing records show that three individuals have billed $14,070 to date on this case—well more than the $6,750 that counsel stands to receive under the settlement agreement.  Dkt. 24-2.  That lodestar does not include hours expended by Weiss's other attorneys, Urban & Taylor S.C., which could have resulted in an additional $6,000 in fees.  Counsel's 45% contingency arrangement with Weiss is consistent with attorney fees approved in other FLSA settlements in this circuit.  *See Hernandez v. Cameo Investments, LLC*, No. 19-CV-356-WMC, 2019 WL 5558434, at *2 (W.D. Wis. Oct. 28, 2019) (approving FLSA settlement agreement in which 65% of fund ($6,500) was allocated for attorneys' fees and costs); *Okoro v. Pyramid 4 Aegis*, No. 11-C-267, 2012 WL 12356838, at *1 (E.D. Wis. Nov. 15, 2012) (noting that "proportionality between fees and damages is not required" and approving FLSA attorneys' fees amounting to 75% of total award under lodestar approach).  The $477.25 in costs incurred by Weiss's counsel for filing, service, and copies also is reasonable considering the nature and procedural history of this case.

In sum, because all aspects of the settlement agreement appear reasonable, I will approve it.  Because the parties did not discuss the terms of dismissal or the entry of judgment in their motion or settlement agreement, I will give the parties until June 25, 2021 to file a stipulation or joint motion for dismissal before entering judgment and closing this case.

4

ORDER

IT IS ORDERED that

(1)    Plaintiff Debra Weiss's motion for approval of the settlement of her FLSA claims, dkt. 22, is GRANTED and the settlement is APPROVED.

(2)    Plaintiff's motion for conditional certification of a FLSA collective action, dkt. 13, is DENIED as moot.

(3)    The parties shall file a stipulation or joint motion for dismissal as soon as possible, but not later than June 25, 2021.


Entered this 9th day of June, 2021.

BY THE COURT:

/s/
_____
STEPHEN L. CROCKER
Magistrate Judge

# EXHIBIT "10"

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **EDCV 17-00527 JGB (KKx)** | Date | December 14, 2018 |
|---|---|---|---|

| Title | *Lauren Byrne v. Santa Barbara Hospitality Services, Inc., et al.* |
|---|---|

Present: The Honorable    JESUS G. BERNAL, UNITED STATES DISTRICT JUDGE

| MAYNOR GALVEZ | Not Reported |
|---|---|
| Deputy Clerk | Court Reporter |

| Attorney(s) Present for Plaintiff(s): | Attorney(s) Present for Defendant(s): |
|---|---|
| None Present | None Present |

Proceedings:   **Order (1) GRANTING Intervenors' Motion to Strike Shala Nelson's Objection (Dkt. No. 98); (2) GRANTING Plaintiffs' Motion for Final Approval of Class Settlement (Dkt. No. 93); (3) GRANTING Intervenors' Motion for Declaratory Judgment (Dkt. No. 91); and (4) GRANTING Plaintiffs' Motion to Amend (Dkt. No. 149) (IN CHAMBERS)**

There are four motions before the Court. On February 23, 2018, Plaintiffs Lauren Byrne, Jenetta L. Bracy, Bambie Bedford, and Jennifer Disla (collectively "Plaintiffs") filed a Motion for Final Approval of Class Action Settlement. ("MFA," Dkt. No. 93.) On the same day, Intervenors Meghan Herrera, Danielle Hach, Alisa Osborne, Carlie Zufelt, Gena Torres, Regina Cabral, and Sabrina Preciado ("Intervenors") filed a Motion for Declaratory Judgment. ("MDJ," Dkt. No. 91.) These two motions generated a considerable amount of objections and responses, one of them filed by Shala Nelson. ("Nelson's Objection," Dkt. No. 83.) On February 28, 2018, Intervenors filed a Motion to Strike Nelson's Objection. ("MTS," Dkt. No. 98.) Finally, on July 31, 2018, Plaintiffs filed a Motion to Amend the Complaint. ("MTA," Dkt. No. 149.) The Court held hearings on these matters on April 9, 2018, August 6, 2018, and December 10, 2018. Upon consideration of the oral arguments presented and the documents submitted in support of and in opposition to these motions, the Court GRANTS Intervenors' MTS, GRANTS Plaintiffs' MFA, GRANTS Intervenors' MDJ, and GRANTS Plaintiffs' MTA.

## I.    BACKGROUND

On March 21, 2017, Plaintiffs filed a class action complaint against Defendants Santa Barbara Hospitality Services, Inc., The Spearmint Rhino Companies Worldwide, Inc., Spearmint

---

Rhino Consulting Worldwide, Inc., Santa Barbara Hospitality Services, LLC, DG Hospitality Van Nuys, LLC, Rouge Gentlemen's Club, Inc., City of Industry Hospitality Venture, Inc., Farmdale Hospitality Services, Inc., High Expectations Hospitality, LLC, Inland Restaurant Venture I, Inc., Kentucky Hospitality Venture, LLC, L.C.M., LLC, Midnight Sun Enterprises, Inc., Nitelife, Inc., Olympic Avenue Venture, Inc., Wild Orchid, Inc., Rialto Pockets, Incorporated, Santa Barbara Hospitality Services, Inc., Santa Maria Restaurant Enterprises, Inc., Sarie's Lounge, LLC, The Oxnard Hospitality Services, Inc., Washington Management, LLC, World Class Venues, LLC, W P B Hospitality, LLC, City of Industry Hospitality Venture, LLC, Farmdale Hospitality Services, LLC, High Expectations Hospitality Dallas, LLC, Inland Restaurant Venture I, LLC, Kentucky Hospitality Venture Lexington, LLC, LCM1, LLC, Midnight Sun Enterprises, LLC, Nitelife Minneapolis, LLC, Olympic Avenue Ventures, LLC, Rialto Pockets, LLC, Santa Barbara Hospitality Services, LLC, Santa Maria Restaurant Enterprises, LLC, The Oxnard Hospitality Services, LLC, Washington Management Los Angeles, LLC, Wild Orchid Portland, LLC, World Class Venues Iowa, LLC, and WPB Hospitality West Palm Beach, LLC (collectively "Defendants," Dkt. No. 1).

On November 1, 2017, Plaintiffs filed a Second Amended Complaint alleging seven causes of action: (1) violation of the Fair Labor Standards Act ("FLSA") for failure to pay statutory minimum wage and overtime; (2) violation of Cal. Bus. & Prof. Code, §§ 17200–17210; (3) minimum wage violations under California law; (4) overtime violations under California law; (5) meal and rest break violations under California law; (6) record keeping violations under California law; (7) wage payment provisions under California law; (8) California Private Attorneys General Act ("PAGA") violations; (9) breach of contract;  and (10) quantum meruit. ("SAC," Dkt. No. 75 ¶¶ 532–612.)  Plaintiffs bring these claims as a class action under Fed. R. Civ. P. 23.  (Id. ¶ 2.)

On July 31, 2018, Plaintiffs filed a proposed Third Amended Complaint which alleges the same causes of action as the SAC.  ("TAC," Dkt. No. 149-1.)  The only difference between the SAC and the TAC is that Named Plaintiff Bambie Bedford has been removed from the case, and Jennifer Perez has replaced her.  (MTA at 1.)

## A.  The **Trauth** Action

On July 13, 2009, Trauth v. Spearmint Rhino Consulting Worldwide, Inc., et al., Case No. EDCV09-1316 VAP (DTBx) (C.D. Cal. July 13, 2009) was filed in the Central District of California.  Trauth Ct. Dkt. No. 1.  There, the plaintiffs alleged that the people who performed as entertainers at Spearmint Rhino should be treated as employees rather than independent contractors.  Id. ¶ 1.  The parties settled in 2012, agreeing to injunctive relief which required the nightclubs at that time to either treat their entertainers as employees or as owners with stake, such as a shareholder or a limited partner.  Trauth Ct. Dkt. No. 337.

In response, the Trauth defendants established policies that categorized entertainers as employees or members of an LLC.  Id. at 3.  Entertainers could switch classification at any time without consequence, and written materials were created and provided to each current and new

entertainer to facilitate their choice.  <u>Taruth</u> Ct. Dkt. No. 317 at 11–12.  As a part of both options, each entertainer agreed to binding arbitration of all claims and waived the right to bring a class action.  <u>Id.</u> at 14.

## B.  The 2017 Cases

On February 3, 2017, <u>Adriana Ortega v. The Spearmint Rhino Companies Worldwide, Inc. et al.</u>, Case No. 5:17-cv-00206 JGB (KKx) (C.D. Cal. February 3, 2017) was filed.  <u>Ortega</u> Ct. Dkt. No. 1.  Plaintiff Adriana Ortega purports to represent a California class of entertainers for violations of FLSA, including alleged misclassification as independent contractors, and indicated an intent to expand the putative class to a national class.  <u>Ortega</u> Ct. Dkt. No. 48.  That action is also pending before the Court.  The Court stayed that action pending the Supreme Court's decision in <u>Lewis</u>,[1] <u>Ortega</u> Ct. Dkt. No. 48, and later stayed it again pending settlement approval in this case, <u>Ortega</u> Ct. Dkt. No. 59.

Plaintiffs filed this action on March 21, 2017.  (Dkt. No. 1.)  Plaintiffs purport to represent a nationwide class of entertainers for alleged violations of FLSA and other labor laws.  (MFA at 12.)  Defendants filed a motion to stay pending resolution of <u>Lewis</u>.  (Dkt. No. 48.)  The Motion to Stay has been continued multiple times and is currently set for hearing on February 25, 2019.  (Dkt. No. 167.)  On August 29, 2017, the Court granted Intervenors the right to intervene.  (Dkt. No. 61.)  They then filed a Complaint in Intervention.  (Dkt. No. 62.)

On May 3, 2017, <u>Jenetta L. Bracy v. DG Hospitality Van Nuys, LLC et al.</u>, Case No. 5:17-cv-00854 JGB (KKx) was filed.  <u>Bracy</u> Ct. Dkt. No. 1.  Plaintiff Bracy purports to represent a nationwide class of entertainers for alleged violations of the FLSA.  <u>Id.</u> ¶ 1–3.  The Court stayed the <u>Bracy</u> action until October 31, 2017.  <u>Bracy</u> Ct. Dkt. No. 42.

On August 15, 2017, <u>Shala Nelson v. Farmdale Hospitality Services, LLC, dba Blue Zebra Gentleman's Club et al.</u>, Case No. BC671852, was filed in the Los Angeles Superior Court.  Plaintiff Nelson purports to represent a California class of entertainers for alleged violations of PAGA and claims that entertainers who chose to be LLC Members are misclassified.

---

[1] In <u>Lewis v. Epic Sys. Corp.</u>, 823 F.3d 1147 (7th Cir. 2016), <u>cert. granted</u>, 137 S. Ct. 809 (U.S. Jan. 13, 2017) (No. 16-285); <u>Morris v. Ernst & Young LLP</u>, 834 F.3d 975 (9th Cir. 2016), <u>cert. granted</u>, 137 S. Ct. 809 (U.S. Jan. 13, 2017) (No. 16-300), <u>Murphy Oil USA, Inc. v. N.L.R.B.</u>, 808 F.3d 1013 (5th Cir. 2015), <u>cert. granted</u>, 137 S. Ct. 809 (U.S. Jan. 13, 2017) (No. 16-307) (collectively "<u>Lewis</u>"), the United States Supreme Court granted certiorari on the question of: "Whether an agreement that requires an employer and an employee to resolve employment-related disputes through individual arbitration, and waive class and collective proceedings, is enforceable under the Federal Arbitration Act, notwithstanding the provisions of the National Labor Relations Act."  In <u>Epic Sys. Corp. v. Lewis</u>, 138 S. Ct. 1612 (2018), decided on May 21, 2018, the Supreme Court held that such agreements are enforceable under the Federal Arbitration Act.

---

**CIVIL MINUTES—GENERAL**                    Initials of Deputy Clerk jlo

A number of the LLC Members from the <u>Trauth</u> case have formed a group as the Intervenor Class and have hired Intervenor Counsel to represent their interests.  Plaintiffs contend that the LLC agreements could be improved and have articulated suggestions that Plaintiffs and the Intervenor Class believe would improve the Intervenors' status as LLC Members.  (MFA at 20)  Through this action, Plaintiffs and the Intervenor Class do not seek employment status, but to obtain changes to the LLC agreements, enforceable as injunctive relief.  (<u>Id.</u>)  The Court ruled that neither Plaintiffs nor Defendants are able to adequately represent the interests of the Intervenor Class, the members of which must be allowed to intervene to protect their interests as LLC Members.  (Dkt. No. 61.)

In July 2017, the parties engaged in a private mediation session in Los Angeles, California.  (MFA at 36.)  Following that mediation session and a number of telephonic negotiations, the parties reached a settlement agreement.  (<u>Id.</u>)

## C.  Allegations

On October 4, 2017, Plaintiffs filed their Motion for Preliminary Approval ("MPA," Dkt. No. 64), which the Court granted ("Preliminary Approval Order," Dkt. No. 74).  In Plaintiffs' MPA, they contended Defendants subject their exotic dancers to a series of illusory contracts which give the appearance that the exotic dancers were members of the limited liability company formed subsequent to <u>Trauth</u>.  (MPA at 11.)  Plaintiffs alleged that the new agreements have not changed anything in Defendants' operations.  (<u>Id.</u>)  They alleged the exotic dancers at Defendants' establishments did not have any real decision-making authority, did not share equitably in the profitability of Spearmint Rhino, and did not have the right to control Spearmint Rhino management.  (<u>Id.</u>)  They alleged that, as an economic reality, Plaintiffs were not in business for themselves, nor independent, but were economically dependent on finding employment through Spearmint Rhino.  (<u>Id.</u> at 12.)

Defendants contended the LLC operating agreements contained legally valid and binding arbitration clauses which waived class action proceedings.  (<u>Id.</u> at 13.)  Defendants also argued they already implemented the injunctive relief sought in the aftermath of <u>Trauth</u>.  (<u>Id.</u>)  Moreover, Defendants argued that entertainers earned more as LLC Members than they would as employees.  (<u>Id.</u> at 14.)

## D.  Objections and Responses

There were three objections filed in response to the Court's Preliminary Approval Order.  The first, Nelson's Objection, was filed on January 22, 2018.  On February 28, 2018, Plaintiffs filed a response to Nelson's Objection.  ("Plaintiffs' Nelson Response," Dkt. No. 96.)  On the same day, Defendants also filed a response to Nelson's Objection.  ("Defendants' Nelson Response," Dkt. No. 102.)  Thereafter, Intervenors filed their MTS.

---

**CIVIL MINUTES—GENERAL**

On February 5, 2018, Objector Ashley Ingraham filed an objection. ("Ingraham's Objection," Dkt. No. 89.) On February 28, 2018, Defendants filed a response. ("Defendants' Ingraham Response," Dkt. No. 107.)

On February 16, 2018, Objector Adriana Ortega filed an objection. ("Ortega's Objection," Dkt. No. 90.)[2] On February 28, 2018, Plaintiffs filed a response to Ortega's Objection. ("Plaintiffs' Ortega Response," Dkt. No. 97.) On the same day, Defendants also filed a response to Ortega's Objection. ("Defendants' Ortega Response," Dkt. No. 101.) Also on February 28, 2018, Intervenors filed a general response to the three objections. ("Intervenors' Objection Response," Dkt. No. 99.) On March 2, 2018, Ortega filed a consolidated reply to Plaintiffs', Defendants', and Intervenors' objection responses. ("Ortega Objection Reply," Dkt. No. 107.)

On February 23, 2018, Intervenors filed their MDJ. On March 1, 2018, Ortega filed an opposition. ("Ortega's MDJ Opposition," Dkt. No. 105.) Intervenors filed a reply on March 14, 2018. ("MDJ Reply," Dkt. No. 112.)

On February 23, 2018, Plaintiffs filed their MFA, accompanied by the declaration of Ryanne Cozzi, a director with Kurtzman Carson Carlson, LLC, & Co. ("KCC"), the claims administrator ("Cozzi Declaration," Dkt. No. 93-1). On March 1, 2018, Ortega filed an opposition. ("MFA Opposition," Dkt. No. 106.) Plaintiffs filed a reply on March 8, 2018. ("MFA Reply," Dkt. No. 109.)

After the hearing on April 9, 2018 ("April Hearing"), the Court ordered the parties to submit supplemental briefing to address three issues: (1) whether the parties can effect notice on class members using additional methods; (2) the appropriate calculation of class members' potential recovery which includes all claims alleged and the percentage of that total which the Settlement Agreement contemplates will be recovered by class members; and (3) the exact nature of the declaratory relief sought by Intervenors and whether the Court has the legal authority to enter such a judgment. (Dkt. No. 121.) In response, Intervenors and Plaintiffs filed supplemental briefs on May 10, 2018 ("Intervenors' MFA Supp. Brief," Dkt. No. 130; "Plaintiffs' MFA Supp. Brief, Dkt. No. 131), and Ortega filed a supplemental brief on May 18, 2018 ("Ortega's MFA Supp. Brief," Dkt. No. 132).

## E. The Lewis Decision

On May 21, 2018, the Supreme Court issued its decision in Epic Sys. Corp. v. Lewis, 138 S. Ct. 1612 (2018). On May 29, 2018, the Court ordered supplemental briefing on "whether and how the decision in Lewis affects this case and the proposed settlement agreement." (Dkt. No. 136.) On June 8, 2018, Ortega, Plaintiffs, Intervenors, and Defendants filed the supplemental

---

[2] This objection significantly exceeds the limitation of 25 pages set forth in the Central District Local Rules. See L.R. 9(b). Ortega is warned to abide by the page limitations for her future filings. Failure to do so may result in the Court striking her document or other sanctions.

briefs requested by the Court. ("Ortega's <u>Lewis</u> Supp. Brief," Dkt. No. 139; "Plaintiffs' <u>Lewis</u> Supp. Brief," Dkt. No. 140; "Intervenors' <u>Lewis</u> Supp. Brief," Dkt. No. 141; Defendants' <u>Lewis</u> Supp. Brief," Dkt. No. 142.)

**F. Second Notice**

The Court held another hearing on the MFA on August 6, 2018 ("August Hearing"). At the August Hearing, the Court expressed concerns about the adequacy of the notice sent to class members. In response, Plaintiffs indicated they were prepared to disseminate another round of notice via email and reopen the claims period. On August 27, 2018, Plaintiffs, Defendants, and Intervenors jointly submitted a proposed Second Notice of Class Action Settlement ("Second Notice," Dkt. No. 160-1), which provided for a second round of class notice via email. On the same day, Ortega submitted a Brief in Support of her own proposed reminder notice (Dkt. No. 161), accompanied by her proposed notice (Dkt. No. 161-1). On September 18, 2018, the Court issued an order approving the Second Notice and rejecting Ortega's objections. ("Second Notice Order," Dkt. No. 165.) The period in which class members could submit their claim, opt out, or object was extended an additional 30 days. (<u>Id.</u> at 1.)

On December 3, 2018, the Court ordered Plaintiffs to submit updated information on claims submitted, opt-outs, and objections. (Dkt. No. 168.) On December 6, 2018, Plaintiffs filed a final report in support of final approval of the class action settlement ("Final Report," Dkt. No. 171), along with the declaration of Kenneth Jue, a Senior Project Manager with KCC ("Jue Declaration," Dkt. No. 171-1). Attached as Exhibit A to the Jue Declaration was a printout containing the final notice statistics. ("Final Notice Stats.," Dkt. No. 171-1, Exh. A.) Also on December 6, 2018, Ortega filed a response to the Final Report ("Ortega's Final Report Response," Dkt. No. 173) and a notice of a supplemental authorities ("Ortega NSA," Dkt. No. 172). The Court held a final hearing on December 10, 2018 ("December Hearing").

## II.   THE SETTLEMENT AGREEMENT

Plaintiffs submitted a copy of the parties' proposed Settlement Agreement on October 4, 2017. ("Settlement Agreement" or "Settlement," Exh. A-1, Dkt. No. 64-1.) The terms of the Settlement Agreement are discussed below.

**A. Financial Terms and Releases**

In the Settlement Agreement, Defendants deny liability for the claims alleged in the Complaint. (Settlement at 30 ("Defendants deny each and every one of the Claims that are asserted, that will be asserted in the Second Amended Complaint, or could be asserted by the Plaintiffs in the actions.").) Nevertheless, Defendants agree to pay a gross cash settlement amount of up to $5.5 million (<u>id.</u> at 38) and to make available up to $3 million for use as credit benefits ("credit benefit settlement amount") available to class members who do not timely opt into cash payment (<u>id.</u> at 46). In addition, a class member who does timely opt in may elect to receive a credit benefit, worth two times the calculated cash payout, at her qualifying club in lieu

of a cash payout. (<u>Id.</u> at 44.)  The credit benefits consist of overhead payments from qualifying clubs. (<u>Id.</u> at 46.)  The overhead payments are payments made by the entertainers for each day the entertainer performs a set at a club to contribute to the overhead expenses incurred by the club. (<u>Id.</u> at 15.)  Credit benefits, whether selected in lieu of cash or utilized by those who did not timely opt in, must be redeemed no later than twelve months from the Effective Date. (<u>Id.</u> at 45, 48.)  Under no circumstances will Defendants be responsible for making payments in excess of the gross cash settlement amount. (<u>Id.</u> at 38.)  However, to the extent class members elect to receive credit benefits in lieu of cash, that election will not deplete the available credit benefit settlement amount. (<u>Id.</u>)

The amount of individual class member compensation will be calculated based on the number of days each class member danced during the class period ("Dance Days"). (<u>Id.</u> at 42.) The amount for each Dance Day will be calculated by dividing the Net Monetary Settlement Amount[3] by the total number of Dance Days worked by all potential Class Members. (<u>Id.</u>)  "Any amounts remaining in the Net Settlement Amount after distribution to Class Members and payment of attorneys' fees and costs, incentive awards, and class administration costs as well as sums paid by checks not cashed within sixty (60) days of issuance by the Claims Administrator shall revert to Defendants." (<u>Id.</u> at 44.)  Additionally, $100,000 attributed to PAGA will be funded solely by the California Settlement Class Clubs listed in Section 1.11. (<u>Id.</u>)  Of that $100,000, 75% of it will be paid to the Labor and Workforce Development Agency ("LWDA") and 25% of it will revert to the settlement fund.

In exchange, Plaintiffs from California, Texas, Oregon, Florida, Idaho, Iowa, Minnesota, as well as the FLSA Plaintiffs agree to forever release Defendants from claims that arose or could arise from this litigation. (<u>Id.</u> at 49–57.)

The Settlement Agreement provides that class counsel shall receive no more than 25% of the combined gross cash settlement amount and the credit benefit settlement amount, plus reasonable costs that collectively do not exceed $2,144,646.86. (<u>Id.</u> at 40.)  Thus, class counsel seeks $2,144,646.86 in attorneys' fees and costs. (<u>Id.</u>)  Defendants agree not to oppose Class Counsel's application for attorneys' fees provided it does not exceed the agreed-upon percentage of the gross cash settlement amount and credit benefit settlement amount. (<u>Id.</u>)  The Settlement Agreement also provides that the cost of administration will be paid by the Defendants and deducted from the gross cash settlement amount. (<u>Id.</u> at 39.)  Additionally, the Settlement Agreement seeks incentive fees of $2,500 to be awarded to the class representatives. (<u>Id.</u> at 41–42.)

## B. Injunctive Relief

The Settlement Agreement calls for various forms of injunctive relief.  Each club must prominently display in its dressing rooms a Federal and/or State Department of Labor poster so

---

[3] The gross settlement amount minus court-approved attorneys' fees and costs, incentive awards, and Administration Costs. (Settlement Agreement at 14.)

the entertainers have access to the applicable laws relating to employee status.  (Id. at 36.)
Additionally, each club must prominently display in dressing rooms rules that state entertainers
who elect to be classified as employees "shall not tip out ineligible tip employees of the Club such
as managers."  (Id.)

The Limited Liability Agreement (Dkt. No. 61, Exh. 8) shall be modified.  Changes to the
agreement include but are not limited to:  "(i) elimination of dance performance minimum
quotas, and (ii) elective rather than mandatory requirements to participate in an in-person
meeting to resolve disputes."  (Settlement Agreement at 37.)

## C.  Relief for Intervenors

Intervenors seek the entry of a Declaratory Judgment.  (Dkt. No. 61, Exh. 5.)  That
proposed judgment states current entertainers who perform as LLC members are not employees
as defined by state or federal law, and they may continue to perform as LLC members and
owners. (Settlement Agreement at 37–38.)  The Settlement Agreement is expressly conditioned
upon entry of the Declaratory Judgment by the Court.  (Id. at 38.)  The Court shall maintain
jurisdiction for a period of ten years.  (Id.)  Intervenor class counsel shall file semi-annual reports
with the Court and provide status reports as to whether entertainers are being treated as owners
pursuant to the Settlement Agreement.  (Id.)

However, on May 10, 2018, Intervenors filed a supplemental brief which modifies the
declaratory judgment they seek.  In that filing, Intervenors withdraw their request that the Court
pass upon their own status, or the status of any other entertainers, under the state wage-and-hour
laws of Florida, Idaho, Iowa, Kentucky, Minnesota, Oregon, and Texas.  ("Intervenor
Supplemental Brief," Dkt. No. 130 at 1.)  Intervenors also withdraw their request that the Court
judicially declare the employee *vel non* status of absent class members under the FLSA.  (Id. at 1–
2.)  Intervenors retain their request to have their status declared under the law of California as
LLC members.  (Id. at 2.)  Thus, Intervenors now ask the Court to grant their MDJ with these
modifications. (Id. at 1–2.)  See infra § VI.

## III.  MOTION TO STRIKE

## A.  Legal Standard

Rule 12(f) of the Federal Rules of Civil Procedure provides that "[t]he court may strike
from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous
matter. . . ."  "Motions to strike are generally disfavored."  Leghorn v. Wells Fargo Bank, N.A.,
950 F.Supp.2d 1093, 1122 (N.D. Cal. 2013) (citing 5C Charles Alan Wright & Arthur R. Miller,
Federal Practice & Procedure § 1380 (3d ed. 2004)).  "The function of a 12(f) motion to strike is
to avoid the expenditure of time and money that must arise from litigating spurious issues by
dispensing with those issues prior to trial . . . ."  Whittlestone, Inc. v. Handi-Craft Co., 618 F.3d
970, 973 (9th Cir. 2010) (alteration in original) (internal citation omitted).

"In determining whether to finally approve a class action settlement, the Court considers whether there are any objections to the proposed settlement and, if so, the nature of those objections." Moore v. Verizon Commc'ns Inc., No. C 09-1823 SBA, 2013 WL 4610764, at *9 (N.D. Cal. Aug. 28, 2013). Only an aggrieved class member has standing to object to a settlement. See In re First Capital Holdings Corp. Fin. Prods. Sec. Litig., 33 F.3d 29, 30 (9th Cir. 1994). Objectors who were once a part of the class, but who subsequently opt-out, no longer have standing to object to the class settlement. See Zamora v. Ryder Integrated Logistics, Inc., No. 13CV2679-CAB BGS, 2014 WL 9872803, at *1 (S.D. Cal. Dec. 23, 2014); Gatdula v. CRST Int'l, Inc., No. CV1101285VAPOPX, 2015 WL 12697656, at *6 (C.D. Cal. Aug. 26, 2015).

## B. Discussion

Objector Shala Nelson filed her objection on January 22, 2018. (Dkt. No. 83.) She then opted out of the settlement on January 23, 2018. (Dkt. No. 93-15) In their MTS, Intervenors argue Nelson no longer has standing to object to the settlement. (MTS at 1.) The Court agrees. Objectors who were once a part of the class, but who subsequently opt-out, no longer have standing to object to the class settlement. See Zamora, 2014 WL 9872803, at *1 (S.D. Cal. Dec. 23, 2014). Thus, the Court GRANTS Intervenors' MTS and STRIKES Nelson's Objection. (Dkt. No. 83.)

## IV.   FINAL SETTLEMENT APPROVAL

### A. Legal Standard

Class action settlements must be approved by the Court. See Fed. R. Civ. P. 23(e). Whether to approve a class action settlement is "committed to the sound discretion of the trial judge." Class Plaintiffs v. Seattle, 955 F.2d 1268, 1276 (9th Cir. 1992). A strong judicial policy favors settlement of class actions. See id.

Nevertheless, the Court must examine the settlement as a whole for overall fairness. See Hanlon v. Chrysler Corp., 150 F.3d 1011, 1026 (9th Cir. 1998). Neither district courts nor appellate courts have the power to delete, modify, or substitute provisions in the negotiated settlement agreement. See id. "The settlement must stand or fall in its entirety." Id.

In order to approve the class action settlement, the Court must conduct a three-step inquiry. See Adoma v. Univ. of Phoenix, Inc., 913 F. Supp. 2d 964, 972 (E.D. Cal. 2012). First, it assesses whether the parties have met notice requirements under the Class Action Fairness Act. Id. Next, it determines whether the notice requirements of Federal Rule of Civil Procedure 23(c)(2)(B) have been satisfied. Id. Finally, the Court must find that the proposed settlement is fair, reasonable, and adequate under Rule 23(e)(3). Id.

## B. Discussion

### 1. Rule 23(a) and (b)

In its Preliminary Approval Order, the Court certified the Settlement Class in this matter under Rules 23(a) and 23(b)(3). (Preliminary Approval Order at 7–10.) Accordingly, the Court "need not find anew that the settlement class meets the certification requirements of Rule 23(a) and (b)." Adoma, 913 F. Supp. 2d at 974; see also Harris v. Vector Marketing, No. C–08–5198, 2012 WL 381202 at *3 (N.D. Cal. Feb. 6, 2012) ("As a preliminary matter, the Court notes that it previously certified . . . a Rule 23(b)(3) class . . . [and thus] need not analyze whether the requirements for certification have been met and may focus instead on whether the proposed settlement is fair, adequate, and reasonable."); In re Apollo Group Inc. Securities Litigation, Nos. CV 04–2147–PHX–JAT, CV 04–2204–PHX–JAT, CV 04–2334–PHX–JAT, 2012 WL 1378677 at *4 (D. Ariz. Apr. 20, 2012). Here, the Settlement Class has not changed since it was conditionally certified. All the criteria for class certification remain satisfied, and the Court hereby confirms its order certifying the Settlement Class.

### 2. CAFA's Notice Requirement

In their MFA, Plaintiffs state that on November 1, 2017 notice was provided to the appropriate state and federal officials. (MFA at 15 (citing Cozzi Decl.).) Plaintiffs note the final approval hearing is more than ninety days after the issuance of the CAFA notice, such that the final approval order may be entered in accordance with CAFA's notice requirements. (Id.)

### 3. Rule 23(c)(2) Notice Requirements

Rule 23(c)(2)(B) requires the Court "direct to class members the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B). Similarly, Rule 23(e)(1) requires a proposed settlement may only be approved after notice is directed in a reasonable manner to all class members who would be bound by the agreement. Fed. R. Civ. P. 23(e)(1).

In its Preliminary Approval Order, the Court approved the notice sent to the settlement class members. (Preliminary Approval Order at 7.) KCC timely mailed the Notice and Settlement Agreement to the 8,472 mailing addresses on the class list. (Cozzi Decl. ¶¶ 6–7.) As of February 23, 2018, 2,012 packets from the original mailing had been returned to KCC as undeliverable. (Id. ¶ 7.) KCC then re-mailed 1,567 packets to updated addresses based on KCC research. (Id.) The remaining 429 notice packets remained undeliverable. (Id.) As of February 23, 2018, KCC had received 62 opt-outs[4] (id. ¶ 10) and had processed 373 claims, or 4.4% of the class membership (Id. ¶ 15). The number of Dance Days claimed in the 373 claims submitted by February was 46,376, or 10.5% of the total of 440,050 Dance Days worked by all class members.

---

[4] Eight of which were received late. (Cozzi Decl. ¶ 10.)

(Id. ¶ 4; 15.)  Ultimately, KCC received 546 claims in response to the first round of notice.  (Final Notice Stats.)

As a result of the concerns the Court raised regarding notice at the August Hearing, the parties jointly submitted a proposed Second Notice, which the Court approved.  (See Second Notice Order.)  The Second Notice was sent by email on September 28, 2018 (Jue Decl. at 2) to 6,208 class members (Final Notice Stats.).  Class members had a 30-day window in which to submit their claim forms via email or first class mail, opt out, or object.  (Second Notice at 2, 9-12.)  After the Second Notice was sent, KCC received an additional 20 claims (Jue Decl. at 2), bringing the percentage of claim forms submitted to 6.68% (Final Notice Stats.).  In their Final Report, Plaintiffs stated that, "[a] the result of the inclusion of these additional twenty entertainers, . . . 224,741 Dance Days out of the total of 440,050 have been claimed, or approximately 51%."  (Final Report at 2.)  However, at the December Hearing, Plaintiffs informed the Court that the number of Dance Days worked by the twenty additional class members was, upon verification, discovered to be lower, and that the most up-to-date estimate of the percentage of Dance Days accounted for was 12 to 13%.  KCC received three additional opt-outs[5] (Jue Decl. at 3) and no new objections (Final Notice Stats.).

The Second Notice addresses Ortega's contention that notice by mail alone was insufficient.  (See Ortega's Objection at 49.)  However, Ortega continues to argue that notice was ineffective.  (Ortega's Final Report Response at 2.)  She points out that KCC received only twenty additional claims as a result of the Second Notice, which she argues "demonstrates that the notice did not clearly and adequately inform class members of their rights or their options[.]"  (Id.)  She also contends that adequate notice must include a means to electronically submit a claim form.  (Id.)  However, the Court has already addressed and rejected Ortega's arguments regarding the clarity of the Second Notice and the necessity of an online form for submitting claims.  (Second Notice Order at 2–4.)

In line with the cases Ortega cites, (Ortega's Objection at 49–50 (citing Sobel v. Hertz Corp., 2013 WL 5202027, at *5 (D. Nev. Sept. 13, 2013) (finding first class mail in combination with email notice is the best notice practicable); Spann v. J.C. Penny Corp., 314 F.R.D. 312, 331 (C.D. Cal. 2016) (approving post card notice and email notice); Ma v. Covidien Holding, Inc., 2014 WL 360196, at *5 (C.D. Cal. Jan. 31, 2014) (requiring reminder notice and email distribution of proposed class action settlement))), the Court finds that the combination of notice by mail and by email was the best notice practicable under the circumstances.

### 4.  Rule 23(e)

Under Rule 23(e), "the claims, issues, or defenses of a certified class may be settled . . . only with the court's approval."  Fed. R. Civ. P. 23(e).  "The primary concern of [Rule 23(e)] is

---

[5] One class member submitted both a claim and an opt-out form.  (Jue Decl. at 3.)  "KCC is attempting to contact her to clarify her intent.  For purposes of [Jue's] declaration, KCC is considering her a claimant and not opting out."  (Id.)

**CIVIL MINUTES—GENERAL**

the protection of those class members, including the named plaintiffs, whose rights may not have been given due regard by the negotiating parties." Officers for Justice v. Civil Serv. Comm'n of City & Cnty. of San Francisco, 688 F.2d 615, 624 (9th Cir. 1982). The Court's inquiry is procedural in nature. Id. Pursuant to Rule 23(e)(2), "[i]f the proposal would bind class members, the court may approve it only after a hearing and on finding that it is fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2). The Court held a final approval hearing on April 9, 2018. In determining whether a settlement agreement is fair, adequate, and reasonable to all concerned, the Court may consider some or all of the following factors:

    (1) the strength of the plaintiff's case;

    (2) the risk, expense, complexity, and likely duration of further litigation;

    (3) the risk of maintaining class action status throughout the trial;

    (4) the amount offered in settlement;

    (5) the extent of discovery completed, and the stage of the proceedings;

    (6) the experience and views of counsel;

    (7) the presence of a governmental participant; and

    (8) any opposition by class members.

Linney v. Cellular Alaska P'ship, 151 F.3d 1234, 1242 (9th Cir. 1998). This list of factors is not exclusive and a court may balance and weigh different factors depending on the circumstances of each case. See Torrisi v. Tucson Elec. Power Co., 8 F.3d 1370, 1376 (9th Cir. 1993).

    **a.   Strength of Plaintiffs' Case**

    The initial fairness factor addresses Plaintiffs' likelihood of success on the merits. See Rodriguez v. W. Publ'g Corp., 563 F.3d 948, 964–65 (9th Cir. 2009). In determining the probability of Plaintiffs' success on the merits, there is no "particular formula by which that outcome must be tested." Id. at 965.

    On May 21, 2018, the Supreme Court decided Lewis, 138 S. Ct. 1612 (2018), which validated class action waivers in arbitration agreements. Ortega's MFA Opposition and Plaintiffs' MFA Reply were filed before the Supreme Court's decision, and thus advanced arguments based on the potential outcome of that case. Ortega argued exotic dancer misclassification cases had a proven record of being successfully litigated by plaintiffs. (MFA Opposition at 12.) She cited a string of cases which resulted in a high settlement or jury award to dancers as proof that Plaintiffs' case here was quite strong. (Ortega Opposition at 20–22.) Ortega argued the agreed upon settlement amount could not be justified when compared with recent exotic dancer classification lawsuits. (MFA Opposition at 12.) In response, Plaintiffs claimed Ortega underestimated the risk posed by the Supreme Court's then-pending decision in

<u>Lewis</u>. (MFA Reply at 7.) Plaintiffs emphasized that the Supreme Court's decision in <u>Lewis</u> could severely impact this case, as it could force the Plaintiffs into individual arbitration and result in the class not recovering at all. (<u>Id.</u> at 7–8.)

After the <u>Lewis</u> decision, Plaintiffs, Defendants, and Intervenors filed concurrent supplemental briefs addressing whether and how the outcome in <u>Lewis</u> affects this case. (<u>See</u> Ortega's <u>Lewis</u> Supp. Brief; Plaintiffs' <u>Lewis</u> Supp. Brief; Intervenors' <u>Lewis</u> Supp. Brief; Defendants' <u>Lewis</u> Supp. Brief.) Plaintiffs, Defendants, Intervenors, and Ortega all agree that the decision in <u>Lewis</u> will make it more difficult for Plaintiffs to prevail on their claims against Defendants. (<u>See</u>, <u>e.g.</u>, "Ortega's <u>Lewis</u> Supp. Brief," Dkt. No. 139 at 1 ("if the Court were to deny final approval of the settlement, Plaintiffs in this action, along with Ms. Ortega . . . will be foreclosed from arguing that the arbitration agreements in their contracts violate the NLRA.").) Defendants, Plaintiffs, and Intervenors argue this decision increases the fairness of the Settlement Agreement, as Plaintiffs' likelihood of success has diminished. (<u>See generally</u> Dkt. Nos. 140, 141, 142.) Ortega argues <u>Lewis</u> does not completely prohibit class wage claims in the future, but simply narrows the ground upon which arbitration agreements may be held unenforceable. (Ortega's <u>Lewis</u> Supplemental Brief at 1–2.)

Given the challenges that could potentially be faced in continued litigation over arbitration issues, and especially the heightened risk of an adverse outcome due to the decision in <u>Lewis</u>, the Court finds this factor favors the granting the MFA. <u>See</u> <u>Barbosa v. Cargill Meat Solutions Corp.</u>, 1:11-CV-00275-SKO, 2013 WL 3340939, at *12 (E.D. Cal. July 2, 2013) ("Plaintiffs' likelihood of success appears to have been properly accounted for in the settlement amount.")

### b. Risk, Expense, Complexity, and Likely Duration of Further Litigation

In assessing the risk, expense, complexity, and likely duration of further litigation, the Court evaluates the time and cost required. "[U]nless the settlement is clearly inadequate, its acceptance and approval are preferable to lengthy and expensive litigation with uncertain results." <u>Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.</u>, 221 F.R.D. 523, 526 (C.D. Cal. 2004) (quoting 3 Newberg on Class Actions § 11:50 (4th ed. 2012)).

Here, without the settlement, the parties would continue litigating the class certification issue as well as the ultimate merits of the case – a long, complex, and expensive process. Therefore, the settlement avoided further protracted and expensive litigation. Accordingly, the Court finds this factor weights in favor of settlement approval.

### c. Risk of Maintaining Class Action Status Throughout the Trial

Because the Court is not aware of any risks to maintaining class-action status throughout trial, this factor is neutral. <u>Barbosa</u>, 2013 WL 3340939 at *13; <u>see also</u> <u>In re Veritas Software Corp. Sec. Litig.</u>, No. 03–0283, 2005 WL 3096079, at *5 (N.D. Cal. Nov. 15, 2005) (<u>vacated in part on other grounds</u>, 496 F.3d 962 (9th Cir. 2007)) (favoring neither approval nor disapproval

of settlement where the court was "unaware of any risk involved in maintaining class action status"); <u>Vasquez v. Coast Valley Roofing, Inc.</u>, 266 F.R.D. 482, 489 (E.D. Cal. 2010) (finding that there were no facts that would defeat class treatment, the factor was considered "neutral" for purposes of final approval of class settlement).

### d. Amount Offered in Settlement

In their MPA, Plaintiffs failed to estimate their maximum amount of damages assuming their litigation is completely successful. In their MFA, Plaintiffs estimate the maximum recovery in this litigation is $37,404,250. (MFA at 31.) Plaintiffs calculated this figure by stating there are 440,050 total Dance Days which the entertainers performed at Defendants' establishments. (<u>Id.</u>) Further, each dancer worked an average of nine hours per shift at an average of $9 per hour. (<u>Id.</u>) Thus, Plaintiffs argue the appropriate calculation for the minimum wage claim is as follows: 440,050 (Dance Days) x 5 (hours per shift) x $9 (wages per hour). (<u>Id.</u> at 31–32.) This leads to a total of $19,802,250 in unpaid wages. (<u>Id.</u> at 32.) Additionally, Plaintiffs estimate that the misappropriated tips claim is worth an additional $17,602,000. (<u>Id.</u>) They calculated this number by multiplying the number of Dance Days by $40, which Plaintiffs allege was the average amount per shift. Thus, the calculation is as follows: 440,050 (Dance Days) x 40 (average tip per shift). (<u>Id.</u>) Plaintiffs then add the two claims together to reach a total maximum recovery of $37,404,250. (<u>Id.</u> at 31.)

The objectors strongly dispute these calculations. Ingraham, a former dancer, claims the minimum shift where she worked was six hours. (Ingraham's Objection at 11, 13.) Additionally, the average shift was closer to eight hours. (Ingraham Declaration, Dkt. No. 89 ¶ 8.) Ortega, relying on Ingraham's representations, argues Plaintiffs have miscounted the average hours worked per shift and have also greatly underestimated the tip claim. (MFA Opposition at 7.) More troubling, however, is Ortega's contention that Plaintiffs calculated the maximum potential liability for only two of their seven claims. (<u>Id.</u> at 7–8.) Ortega notes Plaintiffs did not calculate the value of their "overhead fees" claim, nor the value of the state law claims released under the settlement. (<u>Id.</u> at 7–8.) Ortega also provides her own estimations of Plaintiffs' claims, and states she believes the total value to be upwards of $200,000,000. (<u>Id.</u> at 8.)

In reply, Plaintiffs state their estimates are based on actual data gleaned from the class members, not merely speculations. (MFA Reply at 5–6.) However, Plaintiffs entirely fail to address Ortega's contention that they only calculated the maximum total recovery for some of their claims. This omission is concerning. In order for the Court to approve a settlement agreement, it must juxtapose the value of the settlement against the total maximum liability for all, not just some, of Plaintiffs' claims. <u>See</u> <u>Cotter v. Lyft, Inc.</u>, 176 F. Supp. 3d 930, 935 (N.D. Cal. 2016) ("In determining whether the proposed settlement falls within the range of reasonableness, perhaps the most important factor to consider is plaintiffs' expected recovery balanced against the value of the settlement offer."). Furthermore, Ortega is concerned that the total number of Dance Days Plaintiffs claim are at stake in this litigation may be far understated. (MFA Opposition at 8 n.7) The Court notes that the proposed class contains 8,472 members. (MFA at 3.) Defendants provided KCC with information showing the total number of Dance

Days worked by all the class members equaled 440,050.  (Cozzi Decl. ¶ 4.)  Based on these numbers, over a course of three years, or 1,092 days, each dancer worked an average of 52 shifts, which is a little more than 17 shifts per year.  Ortega believes Plaintiffs' base figure of 440,050 Dance Days to be artificially low.  However, without evidence to the contrary, Ortega's beliefs amount to mere conjecture.

In response to the concerns the Court voiced at the April Hearing, Plaintiffs submitted supplemental briefing which recalculates their potential recovery assuming a maximum liability. Plaintiffs now state the exposure for the FLSA minimum wage claim is $15,952,812.50, and the average entertainer worked an average of 13.53 hours per week.  (Plaintiffs' MFA Supp. Brief at 3–4.)  Plaintiffs believe the class members are not entitled to overtime damages under the FLSA. (Id. at 4.)  Plaintiffs maintain the misappropriated tip claim is appropriately valued at $17,602,000.  (Id.)  Additionally, Plaintiffs allege the state claims to be worth a total of $13,541,557.33 and the PAGA claims to be worth a total of $1,507,825.  (Id. at 9–10.)  All told, Plaintiffs' reestimation of their maximum total recovery is $47,995,694.83, a figure about $10,000,000 or 33% more than their original estimate.  (Id. at 10.)  Plaintiffs state they calculated these figures by using numbers in a sample size of 10% of the total class period.  (Id. at 5.)  Ortega makes several arguments in opposition.  First, she argues Plaintiffs have unjustifiably discounted the PAGA penalties by about 75%, and that the total amount of maximum recovery should be closer to $52,000,000, not $47,000,000.  (Ortega MFA Supp. Brief at 4 n.2.)  Second, she argues Plaintiffs still have not calculated the maximum liability for the claim regarding overhead payments.  (Id. at 5.)  Upon careful review of the SAC and TAC, while Plaintiffs twice mention "overhead fees" or "house fees" (SAC ¶¶ 290, 321; TAC ¶¶ 291, 322), it does not appear Plaintiffs ever formally converted these references into a separate claim for overhead fees as they did for misappropriated tips or for overtime pay.

Plaintiffs argue the $8,500,000 Settlement Amount, which includes the gross cash settlement amount and the credit benefit settlement amount, is appropriate.  (MFA at 31.)  This figure represents 18% of Plaintiffs' reestimated maximum liability, and 16% of Ortega's estimation.  At the December Hearing, Defendants indicated that, depending on the amount of attorneys' fees approved by the Court, the cash amount per Dance Day that will be paid to class members ranges from $7.20 to $12.28, and the total cash amount that will be paid to class members ranges from $350,884 to $598,453.  The remainder of the net cash settlement amount will revert to Defendants.  Thus, only a small percentage of the settlement amount will actually be paid to class members.[6]

Also at the December Hearing, the parties informed the Court that no class member had elected to receive credits in lieu of cash.  Nonetheless, Plaintiffs asserted that they expect a good redemption rate for the credits available to class members who did not timely opt in.  Ortega

---

[6] Based on the range provided ($350,884 to $598,453), roughly 6–11% of the gross cash settlement amount of $5.5 million will be paid to class members.  This represents about 0.73-1.25% of Plaintiffs' maximum total recovery.

**CIVIL MINUTES—GENERAL**                    Initials of Deputy Clerk jlo

argues that the credit option, "by which the Parties attempt to inflate the value of the settlement by $3 million, provides no real value to class members[.]"  (Ortega's Final Report Response at 4.)  While the Court has doubts about the likelihood of a high credit redemption rate by class members who did not timely opt in,[7] it finds the availability of credits adds value to the settlement agreement because it provides those who did not respond in time an additional opportunity to obtain compensation after final approval, a feature rarely found in class action settlement agreements.

As noted above, the cash amount that will be paid to class members is quite small in proportion to the total settlement amount and the estimated maximum liability.  Nonetheless, in light of Plaintiffs' weakened position post-Lewis and the value added by the credits available to class members who failed to opt in, the Court finds the amount offered in the settlement appropriate. Therefore, this factor weighs in favor of approval.

### e.  Extent of Discovery Completed and Stage of the Proceedings

This factor requires the Court evaluate whether "the parties have sufficient information to make an informed decision about settlement."  Linney, 151 F.3d at 1239.

Here, the parties engaged in discovery and investigation, which allowed them to effectively assess the strengths and weaknesses of the claims.  (MFA at 22.)  They reached this settlement only after a mediation session before the Honorable Robert Altman (retired).  (MPA at 16.)  Based on the MFA, it appears that each side maintains a clear idea of the strengths and weaknesses of their respective cases, such that the extent of discovery completed and the stage of the proceedings weighs at least somewhat in favor of preliminary approval.  See Lewis v. Starbucks Corp., No. 2:07-cv-00490-MCE, 2008 WL 4196690, at *6 (E.D. Cal. Sept. 11, 2008) ("[A]pproval of a class action settlement is proper as long as discovery allowed the parties to form a clear view of the strengths and weaknesses of their cases.").

### f.  Experience and Views of Counsel

In considering the adequacy of the terms of a settlement, the trial court is entitled to, and should, rely upon the judgment of experienced counsel for the parties.  See DIRECTV, Inc., 221 F.R.D. at 528 ("Great weight is accorded to the recommendation of counsel, who are most closely acquainted with the facts of the underlying litigation[.]") (internal quotation marks and citations omitted).  This reliance is predicated on the fact that "[p]arties represented by competent counsel are better positioned than courts to produce a settlement that fairly reflects

---

[7] These doubts are based on 1) the fact that no class member who timely opted in selected the credit option, 2) that those who have not responded are less likely to be aware of the settlement or their right to redeem the credits, and 3) that redemption is subject to a number of qualifications, including that credits can be redeemed only at each class member's qualifying club (see Settlement at 47–48), i.e., the club at which the class member performed during the class period (id. at 16).

---

**CIVIL MINUTES—GENERAL**          Initials of Deputy Clerk jlo

each party's expected outcome in the litigation." In re Pac. Enters. Sec. Litig., 47 F.3d 373, 378 (9th Cir. 1995).

Here, counsel in both the Byrne and Bracy actions endorse the settlement as fair, adequate, and reasonable. (MFA at 36.)  Additionally, Plaintiffs' Counsel have extensive experience litigating class action wage and hour suits such as this one. (See Dkt. Nos. 64-3–64-5.) As a result, the experience and views of Plaintiffs' Counsel also weigh in favor of preliminary approval.

### g. Presence of a Governmental Participant

No governmental entity is present in this litigation.  Therefore this factor favors approval.

### h. Opposition by Class Members

There have been three total objections to this settlement, one of which has been stricken. Additionally, as of October 29, 2018 (the extended deadline), out of 8,472 class members, there have been 566 claims made, and 65 opt-outs,[8] (Final Notice Stats.) and two objections.[9]  The opt-out percentage is 0.77% of the class members, and 10.3% of all responding dancers.  The objection percentage is 0.02% of the total class members and 0.32% of the responding dancers.  While the low percentage of objections weighs in favor of granting the MFA, the arguments presented within them are substantive and reasonable, which weighs against approval.

In addition to all the other arguments she has put forward, Ortega argues this settlement was collusive. (MFA Opposition at 16.)  Ortega argues the declaratory judgment provision sought by Intervenors was originally created by Plaintiffs' Counsel while they represented a defendant in another action. (Id.)  Ortega states the declaratory judgment would "effectively insulate Defendants from liability under federal and state laws in perpetuity." (Id.)  Additionally, Ortega points to the clear-sailing and reversion clauses as demonstrating inappropriate collusion. (Id. at 16–17.)  Moreover, Ortega argues the settlement expands the previously operative complaint, and now releases the claims under the state laws of every state in which Defendants operate. (Id. at 17 (citing Banks v. Nissan N. Am., Inc., 2015 WL 7710297, at *12 (N.D. Cal. Nov. 30, 2015) (denying final approval for a settlement which included, as a benefit to the defendant, "nationwide litigation immunity")).)

Plaintiffs argue the presence of a reversionary clause is insufficient to deem a settlement collusive. (MFA Reply at 11 (citing Williams v. MGM-Pathe Communications Co., 129 F.3d 1026, 1027 (9th Cir. 2017) (approving a settlement even where unclaimed funds would revert to

---

[8] Eight of the original 62 opt-outs received after the first round of notice were received late. (Final Notice Stats.)  However, because the opt-out deadline was extended, the Court counts the late opt-outs among the valid opt-outs.

[9] The Court counts two of the three objections received because Nelson's objection has been stricken.  See supra.

the defendant)).) Plaintiffs also argue Ortega's allegations of collusion are meritless, and point to the formal mediation session they had before a retired judge as evidence that the Settlement Agreement was reached following arms-length discussions. (Id. at 9–10.) Taken together, while the Court has serious concerns regarding the nature of the Settlement Agreement and the issues raised by Ortega, the small number of total objections is notable. Thus, this factor weighs neither in favor nor against final approval.

After considering all of the relevant factors, the Court concludes they favor approval. The Court finds that the Settlement Agreement is "fair, reasonable and adequate to all concerned parties." Ficalora v. Lockheed Cal. Co., 751 F.2d 995, 996 (9th Cir. 1985). Therefore, the Court APPROVES the Settlement Agreement.

## V. ATTORNEYS' FEES AND COSTS

### A. Legal Standard

The procedure for requesting attorneys' fees is set forth in Rule 54(d)(2). While the rule specifies requests shall be made by motion "unless the substantive law governing the action provides for the recovery of . . . fees as an element of damages to be proved at trial," the rule does not itself authorize the awarding of fees. "Rather, [Rule 54(d)(2)] and the accompanying advisory committee comment recognize that there must be another source of authority for such an award . . . [in order to] give[ ] effect to the 'American Rule' that each party must bear its own attorneys' fees in the absence of a rule, statute or contract authorizing such an award." MRO Commc'ns, Inc. v. AT&T, 197 F.3d 1276, 1281 (9th Cir. 1999).

In class actions, statutory provisions and the common fund exception to the "American Rule" provide the authority for awarding attorneys' fees. See Alba Conte and Herbert B. Newberg, Newberg on Class Actions, § 14.1 (4th ed. 2005) ("Two significant exceptions [to the "American Rule"] are statutory fee-shifting provisions and the equitable common-fund doctrine."). Rule 23(h) authorizes a court to award "reasonable attorney's fees and nontaxable costs that are authorized by law or by the parties' agreement." Fed. R. Civ. Proc. 23(h). Under normal circumstances, once it is established that a party is entitled to attorneys' fees, "[i]t remains for the district court to determine what fee is 'reasonable.'" Hensley v. Eckerhart, 461 U.S. 424, 433 (1983).

### B. Discussion

Class Counsel requests approval of $2,125,000 in attorneys' fees plus $19,646.86 in costs, for a total of $2,144,646.86. (MFA at 38.) Courts are obliged to ensure the attorneys' fees awarded in a class action settlement are reasonable, even if the parties have already agreed on an amount. In re Bluetooth Headset Prods. Liab. Litig., 654 F.3d 935, 941 (9th Cir. 2011).

A court may exercise discretion to award attorneys' fees in a class action settlement by applying either the lodestar method or the percentage-of-the-fund method. Fischel v. Equitable

---

**CIVIL MINUTES—GENERAL**            Initials of Deputy Clerk jlo

Life Assurance Soc'y of U.S., 307 F.3d 997, 1006 (9th Cir. 2002).  The court determines the lodestar amount by multiplying the number of hours reasonably expended on the litigation by a reasonable hourly rate.  McGrath v. Cnty. of Nev., 67 F.3d 248, 252 (9th Cir. 1995).  The hourly rates used to calculate the lodestar must be "in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation."  Blum v. Stenson, 465 U.S. 886, 895 n.11 (1984).  Next, the court must decide whether to adjust the 'presumptively reasonable' lodestar figure based upon the factors listed in Kerr v. Screen Extras Guild, Inc., 526 F.2d 67, 69–70 (9th Cir. 1975), that have not been subsumed in the lodestar calculation, Caudle v. Bristow Optical Co., Inc., 224 F.3d 1014, 1028–29 (9th Cir. 2000).[10] Under the percentage-of-the-fund method, an award of twenty-five percent of the gross settlement amount is the "benchmark" for attorneys' fees calculations.  Powers v. Eichen, 229 F.3d 1249, 1256-57 (9th Cir. 2000).

Defendants do not oppose Class Counsel's fee request.  (MFA at 38.)  Plaintiffs have not provided a lodestar calculation.  Generally, courts find that a benchmark of twenty-five percent of the common fund is a reasonable fee award.  Monterrubio v. Best Buy Stores, L.P., 291 F.R.D. 443, 455 (E.D. Cal. 2013) (citing Six (6) Mexican Workers v. Arizona Citrus Growers, 904 F.2d 1301, 1311 (9th Cir. 1990)).  However, as discussed supra, the value that will actually go to class members in this case, whether in cash or credits, is significantly less than $8.5 million.  The Court therefore finds 20% of the settlement amount, or $1,700,000, appropriate.  Additionally, the Court approves $19,646.86 in costs.

## VI.  INCENTIVE AWARDS

### A.  Legal Standard

The trial court has discretion to award incentives to the class representatives.  See In re Mego Fin. Corp. Sec. Litig., 213 F.3d 454, 463 (9th Cir. 2000); Pelletz, 592 F. Supp. 2d at 1329. The criteria courts have used in considering the propriety and amount of an incentive award include: (1) the risk to the class representative in commencing a class action, both financial and otherwise; (2) the notoriety and personal difficulties encountered by the class representative; (3) the amount of time and effort invested by the class representative; (4) the duration of the litigation; and (5) the personal benefit, or lack thereof, enjoyed by the class representative as a

---

[10] In Kerr, the Ninth Circuit adopted the 12–factor test articulated in Johnson v. Georgia Highway Express, Inc., 488 F.2d 714 (5th Cir. 1974); this analysis identified the following factors for determining reasonable fees: (1) the time and labor required, (2) the novelty and difficulty of the questions involved, (3) the skill requisite to perform the legal service properly, (4) the preclusion of other employment by the attorney due to acceptance of the case, (5) the customary fee, (6) whether the fee is fixed or contingent, (7) time limitations imposed by the client or the circumstances, (8) the amount involved and the results obtained, (9) the experience, reputation, and ability of the attorneys, (10) the "undesirability" of the case, (11) the nature and length of the professional relationship with the client, and (12) awards in similar cases.

result of the litigation.  Van Vranken v. Atl. Richfield Co., 901 F. Supp. 294, 299 (N.D. Cal. 1995).

## B.  Discussion

Plaintiffs request a service award of $2,500 for the class representatives in this action.  A court may grant a modest incentive award to class representatives, both as an inducement to participate in the suit and as compensation for the time spent in litigation activities.  See In re Mego Fin. Corp., 213 F.3d at 463 (finding the district court did not abuse its discretion in awarding an incentive award to the Class Representatives).  Thus, the Court finds Plaintiffs' request for an enhancement award reasonable.  See Custom LED, LLC v. eBay, Inc., No. 12-CV-00350-JST, 2014 WL 2916871, at *10 (N.D. Cal. June 24, 2014) (approving $7,500 incentive award from $3,230,000 total settlement amount); Glass v. UBS Fin. Servs., Inc., No. C-06-4068 MMC, 2007 WL 221862, at *1, 16-17 (N.D. Cal. Jan. 26, 2007) (approving $25,000 incentive awards from $45,000,000 total settlement amount).   However, proposed class representative Jennifer Perez is not entitled to a service award, as she joins this action as a class representative as a result of this Order.  Accordingly, the Court awards incentive awards for only Jennifer Disla, Lauren Byrne, and Jenetta L. Bracy.

## VII.  MOTION FOR DECLARATORY JUDGMENT

## A.  Legal Standard

The Declaratory Judgment Act states that "in a case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."  28 U.S.C. § 2201(a).  Accordingly, the Ninth Circuit has "long held that the district court must first inquire whether there is an actual case or controversy within its jurisdiction.  Second, if the court finds that an actual case or controversy exists, the court must decide whether to exercise its jurisdiction."  Principal Life Ins. Co. v. Robinson, 394 F.3d 665, 669 (9th Cir. 2005) (internal citation omitted).

The Supreme Court has stated that the case or controversy question under the Declaratory Relief Act is essentially "whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment."  Maryland Cas. Co. v. Pac. Coal & Oil Co., 312 U.S. 270 (1941).  Stated another way, "a justiciable case or controversy exists if a declaration would affect substantive legal rights of the parties."  Mason v. Genisco Tech. Corp., 960 F.2d 849, 853 (9th Cir. 1992) (citations omitted).  Indeed, the Act's case or controversy requirement is satisfied when the plaintiff has "a real and reasonable apprehension that he will be subject to liability."  Societe de Conditionnement en Aluminum v. Hunter Eng'g Co., Inc., 655 F.2d 938, 944 (9th Cir. 1981).

Once a district court has determined whether a case or controversy exists under the Act, the court must then determine whether it will exercise its subject matter jurisdiction.  Principal

Life Ins. Co., 394 F.3d at 669.  In making this determination, "the Brillhart factors remain the philosophic touchstone for the district court."  Government Employees Insurance Co. v. Dizol, 133 F.3d 1220, 1225 (9th Cir. 1998).  Brillhart held that in order to exercise jurisdiction over declaratory actions, the court should (1) avoid needless determination of state laws; (2) discourage litigants from filing declaratory actions as a means of forum shopping; and (3) avoid duplicative litigation.  See id.; Brillhart v. Excess Ins. Co. of Am., 316 U.S. 491 (1942).  Additionally, courts may consider whether a declaratory judgment "will settle all aspects of the controversy; . . . serve a useful purpose in clarifying the legal relations at issue; . . . is being sought merely for the purposes of procedural fencing or to obtain a 'res judicata' advantage; or . . . will result in entanglement between the federal and state court systems."  Dizol, 133 F.3d at 1225 n.5.

## B.  Discussion

Intervenors are current performers at Defendants' clubs.  (MDJ at 1.)  In July 2017, they sought permission to intervene in this action to ensure their status as members and owners in limited liability companies.  (Id.)  The Court granted Intervenors permission to intervene on August 29, 2017.  (Dkt. No. 61.)  The parties in this case entered into a Settlement Agreement which provided Intervenors would seek a declaratory judgment stating that they and other current entertainers perform as LLC members and not as employees.  (Settlement Agreement at 37–38.)  On May 10, 2018, Intervenors amended their request and asked that only they would be declared LLC members.  (Intervenor Supplemental Brief.)  This amendment specifically does not request a declaration of status for other current and future entertainers not named as an Intervenor.  (Id.)  The Settlement Agreement further provides that the Court will maintain jurisdiction for a period of ten years, during which time Intervenors' Class Counsel shall file semi-annual status reports to inform the Court whether the Intervenors are being treated as LLC members.  (Settlement Agreement at 37–38.)

After Trauth, Defendants agreed to classify entertainers as either employees or as members in an LLC.  (MDJ at 2; Trauth, 2012 WL 12893448, at *1.)  The distinctions between employee and LLC member were described in a Notice to Entertainer form.  (MDJ at 2 (citing "Notice to Entertainer," Dkt. No. 64-2, Exh. 7).)  The Notice to Entertainer form explained how employees are under a heightened level of control by Defendants.  (Id. (citing Notice to Entertainer).)  Entertainers who elected not to perform as employees were given the opportunity to become members of a limited liability company under fewer restrictions.  (Id.)  Each LLC is governed by an agreement which defines the parameters of the relationship between the entertainers and the clubs.  ("Operating Agreement," Dkt. No. 64-2, Exh. 8.)  Under the Operating Agreement, entertainers who choose not to be treated as employees ("Class A Members") agree to make a "capital contribution" of $100 and to provide live entertainment.  (Operating Agreement ¶¶ 1.8, 1.12.)  Additionally, Class A Members must make an overhead payment to the club to help cover operational expenses.  (Id. ¶ 1.11.)

Intervenors contend, and the Court agrees, that the appropriate test to determine whether a person is an employee or a member of an LLC was established in Clackamas Gastroenterology Assocs., P. C. v. Wells, 538 U.S. 440, 450 (2003).  (MDJ at 14–15.)  There, the Supreme Court articulated a six factor test: (1) whether the organization can hire or fire the

---

Page 21 of 25                                CIVIL MINUTES—GENERAL                                Initials of Deputy Clerk jlo

individual or set the rules and regulations of the individual's work; (2) whether and, if so, to what extent the organization supervises the individual's work; (3) whether the individual reports to someone higher in the organization; (4) whether and, if so, to what extent the individual is able to influence the organization; (5) whether the parties intended that the individual be an employee, as expressed in written agreements or contracts; (6) whether the individual shares in the profits, losses, and liabilities of the organization. <u>Clackamas</u>, 538 U.S. at 449–50.

As for the first prong, the Operational Agreement states that a majority of Class A Members may propose a plan for the admission of other Class A Representatives. (Operational Agreement ¶ 5.2(g)(ii).) Additionally, Class A Members cannot be terminated at will, but can be "involuntarily withdrawn" for certain acts including unlawful activities and other club violations such as engaging in conflicts of interest or making unauthorized disclosures of club matters. (<u>Id.</u> ¶ 7.2.) The power to fire is bilateral, however, as Class A Members can demand the reprimand, probation, suspension, or termination of any club manager. (<u>Id.</u> ¶ 5.2(g)(iii).) A majority of Class A Members may also present to their manager a request that certain rules of the club be modified, provided those rules are not required by law. (<u>Id.</u> ¶ 5.2(g)(iv).) The manager must then investigate and consider proposals for implementation. (<u>Id.</u>) This factor weighs in favor of LLC member status.

For the second prong, Intervenors state they control all material aspects of their own work. They have submitted declarations which attest to their ability to control their own schedules, determine when they perform, and how many days per week and hours per day they will perform. (MDJ at 17 (citing "Herrera Declaration," Dkt. No. 91-1 ¶ 6; "Hach Declaration," Dkt. No. 91-2 ¶ 6; "Osborne Declaration," Dkt. No. 91-3 ¶ 6; "Zufelt Declaration," Dkt. No. 91-4 ¶ 6; "Torres Declaration," Dkt. No. 91-5 ¶ 6; "Cabral Declaration," Dkt. No. 91-6 ¶ 6; "Preciado Declaration," Dkt. No. 91-7 ¶ 6 (collectively, "Intervenor Declarations")).) Class A Members are in complete control of whether and when they take breaks, including meal breaks and rest breaks. (Operational Agreement, Exh. B.) Additionally, Class A Members may choose to perform for customers on the floor, in a VIP area, or participate in stage rotations. (Intervenor Declarations ¶¶ 4, 7.) Intervenors are not required to perform for any particular customer or in any particular manner. (<u>Id.</u> ¶ 5.) Intervenors do not follow a dress code, can choose their own props, and do not report to a boss. (MDJ at 18.) This factor weighs in favor of LLC member status.

Regarding the third <u>Clackamas</u> factor, Intervenors argue nothing in the Operating Agreement requires them to report to any superior. As discussed above, Intervenors can control their work days, work hours, costume, props, dance locations, and break times. Additionally, there are no performance evaluations. (<u>Id.</u> at 18–19.) This factor weighs in favor of LLC member status.

The fourth prong is whether and, if so, to what extent the individual is able to influence the organization. <u>Clackamas</u>, 538 U.S. at 449–50. Intervenors argue they have the contractual right to influence their companies and clubs on broad levels, including the ability to present plans for marketing, medical care, child care, and propose the clubs bring in additional Class A

CIVIL MINUTES—GENERAL

Members.  (MDJ at 19.)  Additionally, the implementation of a proposed program is subject to final approval of the Class A Members.  (Id.)  This factor favors LLC Member status.

The fifth Clackamas factor is whether the parties intended the individual is an employee as expressed in written agreements.  Intervenors contend the Operating Agreement is clear that they should not be viewed as employees.  (Id. at 19–20.)  Intervenors argue the entire point of the Operating Agreement was to give entertainers the choice between being treated as LLC members versus employees.  (Id. at 20.)  The Court therefore agrees this factor favors LLC member status.

The last Clackamas factor is whether the individual shares in the profits, losses, and liabilities of the organization.  Here, the Operating Agreement states that the "Profits of the Company shall first be allocated as Distributions to Class A Members.  Any remaining Profit and any Losses of the Company shall then be allocated to the Class B Member [(who are treated as employees)]."  (Operating Agreement ¶ 4.1.)  Intervenors are not paid by the hour; the money they make from their performances are pooled and distributed in addition to their earnings derived from dance fees.  (Intervenor Declarations ¶¶ 3, 8.)  Intervenors also are free to negotiate their prices with their customers.  (Id. ¶ 4.)  Intervenors argue they share in the risk of loss in the clubs because they typically reinvest between 10% and 35% back into their trade for costumes, props, and beauty regimens.  (Id. ¶ 9.)  While the Court finds the Intervenors share in the profits of the club, Intervenors' argument that they also share in the club losses is not persuasive.  Consequently, this factor is neutral.

Objector Ortega opposes Intervenors' MDJ.  However, her primary arguments concern Intervenors' original request that the proposed declaration affect the status of non-party current entertainers in addition to the named Intervenors.  (See Ortega's Objection at 33–37.)  However, these concerns are ameliorated by Intervenors' proposed modifications to the MDJ, which now concerns only the named Intervenors and no other entertainers.  Pursuant to that modification, the Court finds the named Intervenors here have not been treated as employees of Defendants but as LLC members.  Accordingly, the Court GRANTS Intervenors' MDJ.

## VIII.   MOTION TO AMEND

### A.  Legal Standard

Leave to amend "shall be freely given when justice so requires."  Fed. R. Civ. P. 15(a).  The Ninth Circuit has held that "'[t]his policy is to be applied with extreme liberality.'"  Eminence Capital, L.L.C. v. Aspeon, Inc., 316 F.3d 1048, 1051 (9th Cir. 2003) (quoting Owens v. Kaiser Found. Health Plan, Inc., 244 F.3d 708, 712 (9th Cir. 2001)).  Leave to amend is not automatic, however.  The Ninth Circuit considers a motion for leave to amend under five factors: bad faith, undue delay, prejudice to the opposing party, the futility of amendment, and whether the plaintiff has previously amended his or her complaint.  Nunes v. Ashcroft, 375 F.3d 805, 808 (9th Cir. 2004).  "The party opposing amendment bears the burden of showing prejudice, unfair delay, bad faith, or futility of amendment."  United Steel, Paper & Forestry, Rubber, Mfg., Energy, Allied Indus. & Serv. Workers Int'l Union, AFL-CIO, CLC v. ConocoPhillips Co., 2009

WL 650730, at *2 (C.D. Cal. Mar. 12, 2009) (citing <u>Eminence Capital</u>, 316 F.3d at 1052; <u>DCD Programs, Ltd. v. Leighton</u>, 833 F.2d 183, 186–87 (9th Cir. 1987)).

**B.  Discussion**

On October 30, 2017, the Court granted preliminary approval of the Settlement Agreement.  On July 31, 2018, Plaintiffs filed their unopposed MTA which seeks to remove Named Plaintiff Bambie Bedford ("Bedford") from this action and replace her with Jennifer Perez ("Perez").  (MTA at 1.)  Plaintiffs argue this change is necessary because Bedford, for reasons unrelated to the terms of the proposed settlement, wishes to be removed from the case. (<u>Id.</u>)  Plaintiffs state they filed this MTA within days of being notified by Bedford that she no longer wanted to continue serving as a class representative.  (<u>Id.</u> at 2.)

"[A]fter a class has been certified, Courts regularly allow replacement of the named plaintiff."  <u>Miller v. Mercedes-Benz USA LLC</u>, No. CV 06-05382 ABC (JTLX), 2009 WL 1393488, at *1 (C.D. Cal. May 15, 2009).  Notably, as part of the settlement, Defendants agreed to certification of state law classes pursuant to Rule 23 of the Federal Rules of Civil Procedure consisting of all current and former entertainers who performed at Defendants' clubs during the applicable period under the laws of California, Florida, Idaho, Iowa, Kentucky, Minnesota, Oregon, and Texas.  (Settlement Agreement at 13.)  Plaintiffs contend Perez is similarly situated to Bedford and the other class representatives as she has performed as an entertainer at Defendants' Dallas, Texas location, like Bedford, from August 24, 2017 to the present day. (MTA at 4.)  Additionally, Perez has reviewed the lawsuit and the settlement agreement currently before the Court for final approval and agreed to act as class representative.  (<u>Id.</u> (citing Dkt. No. 149-2).)

Under Rule 23(a)(3) of the Federal Rules of Civil Procedure, the "test of typicality is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named [p]laintiff, and whether other class members have been injured by the same course of conduct."  <u>Wolin v. Jaguar Land Rover N. Am.</u>, 617 F.3d 1168, 1175 (9th Cir. 2010).  Typicality is a permissive standard.  <u>Hanlon</u>, 150 F.3d at 1020.  The claims of the named plaintiff need not be identical to those of the other class members.  <u>Alonzo v. Maximus, Inc.</u>, 275 F.R.D. 513, 523 (C.D. Cal. 2011).  Here, Perez has had the same job title and duties, and was subject to the same alleged misclassification as members of an LLC as the class members she seeks to represent.  She advances the same legal theories.  This satisfies the typicality requirement.

Additionally, in determining whether a proposed class representative will adequately protect the interests of the class, courts are to inquire (1) whether the proposed class representative and class counsel have any conflicts of interest with the rest of the potential class, and (2) whether the proposed class representative and class counsel will prosecute the action vigorously on behalf of the class as a whole.  <u>See Hanlon</u>, 150 F.3d at 1020; <u>Johnson v. General Mills, Inc.</u>, 275 F.R.D. 282, 288 (C.D. Cal. 2011).  Here, Perez is familiar with this lawsuit and the issues giving rise to the claims.  (MTA at 4–5.)  She has conveyed a willingness and ability to

protect the interest of the class, and the parties have not raised any potential conflicts of interest. This satisfies the adequacy requirement.

Leave to amend "shall be freely given when justice so requires." Fed. R. Civ. P. 15(a). The Ninth Circuit has held that "'[t]his policy is to be applied with extreme liberality.'" <u>Eminence Capital</u>, 316 F.3d at 1051. This MTA is unopposed. Accordingly, the Court GRANTS Plaintiffs' MTA.

## IX.   CONCLUSION

For the reasons stated above, the Court:

(1) GRANTS Intervenors' MTS and STRIKES Nelson's Objection;

(2) Court GRANTS Plaintiffs' MTA;

(3) GRANTS Intervenors' MDJ to the extent Intervenors seek a declaratory judgment which pertains only to the Named Intervenors in this action;

(4) GRANTS Plaintiffs' MFA;

(5) GRANTS IN PART Plaintiffs' request for attorneys' fees and AWARDS Class Counsel attorneys' fees in the amount of $1,700,000 from the gross settlement amount;

(6) GRANTS Plaintiffs' request for costs and AWARDS Class Counsel costs in the amount of $19,646.86 from the gross settlement amount;

(7) GRANTS Plaintiffs' request for service awards and AWARDS a total of $7,500 to the Class Representatives from the gross settlement amount, consisting of $2,500 each to Jennifer Disla, Lauren Byrne, and Jenetta L. Bracy;

(8) GRANTS the request for settlement administration fees and AWARDS Kurtzman Carson Carlson, LLC, & Co. administration fees in the amount up to $85,000 from the gross settlement amount; and

(9) DISMISSES the Third Amended Complaint WITH PREJUDICE.

**IT IS SO ORDERED.**